UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL FEDERATION OF
PROFESSIONAL & TECHNICAL
ENGINEERS, AFL-CIO

        Plaintiff,

    v.

DONALD TRUMP,
President of the United States, et al.,

        Defendants.

Civil Action No. 25-3615 (PLF)

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO NONPARTY GODDARD
ENGINEERS, SCIENTISTS, AND TECHNICIANS ASSOCIATION/IFPTE LOCAL 29'S
EMERGENCY MOTION TO INTERVENE, TO MODIFY THE STAY, AND FOR
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

Table of Contents ............................................................................................................ i

Table of Authorities ...................................................................................................... iii

Background ..................................................................................................................... 2

    I.     Unions Challenge Executive Order 14,251 ............................................. 2

    II.    The President Signs Executive Order 14,343 ......................................... 3

    III.   IFPTE, the National Union for Local 29, Files This Action................................ 4

    IV.   Technological Developments Have Limited the Need for the Goddard Library.... 5

    V.    NASA Concludes the 2012 Settlement Agreement Does Not Apply ..................... 6

    VI.   NASA Has Been Consolidating Material ................................................. 8

    VII.  Local 29 Files the *Williams* Action and Loses on its Motion for a Preliminary Injunction ...................................................................................... 9

    VIII. Local 29 Files the Instant Motion, Seeking Much the Same Relief It Sought Unsuccessfully in *Williams* ................................................................... 11

Legal Standards........................................................................................................... 12

    I.     Motion to Intervene................................................................................ 12

        A.   Mandatory Intervention ............................................................ 12

        B.   Permissive Intervention ............................................................. 13

    II.    Motion to Stay........................................................................................ 13

    III.   Motion for a Preliminary Injunction ..................................................... 13

Argument ..................................................................................................................... 14

    I.     Local 29's Motion to Intervene Should Be Denied .............................. 15

        A.   Local 29's Motion Is Not Timely .............................................. 15

        B.   Mandatory Intervention Is Improper Here Because Local 29 Is Adequately Represented.......................................................................... 17

        C.   Permissive Intervention Is Unwarranted Here......................................... 19

II.     Local 29's Motion to Modify the Stay Should Be Denied ................................... 21

III.    Local 29's Motion for a Preliminary Injunction Should Be Denied..................... 23

     A.     Likelihood of Success on the Merits.......................................................... 23

     B.     Local 29 Faces No Irreparable Injury ........................................................ 36

     C.     Balance of Harms and Public Interest......................................................... 38

     D.     Significant Security Should Be Imposed .................................................... 39

Conclusion ....................................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**

*Am. Fed. of Gov't Emps. v. Secretary of the Air Force,*
716 F.3d 633 (D.C. Cir. 2013) ............................................................................ 24, 25

*Am. Fed. of Gov't Emps. v. Trump,*
929 F.3d 748 (D.C. Cir. 2019) ................................................................... 25, 26, 27, 28

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
167 F.4th 1247 (9th Cir. 2026) .............................................................. 37, 38, 39

*Am. Fed'n of Gov't Emps. Local 2305 v Dep't of Vets. Affs.,*
No. 26-1321, 2026 WL 1379424 (1st Cir. May 16, 2026) .............................................. 34-35

*Am. Foreign Serv. Ass'n v. Trump,*
783 F. Supp. 3d 248 (D.D.C. 2025) ............................................................... 2, 3, 32

*Am. Foreign Serv. Ass'n v. Trump,*
No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ........................................ 3, 29, 38

*Associated Builders & Contractors, Inc. v. Herman,*
166 F.3d 1248 (D.C. Cir. 1999) ...................................................................... 12

*Axon Enter., Inc. v. FTC,*
598 U.S. 175 (2023) ................................................................................. 25

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh,*
295 F.3d 28 (D.C. Cir. 2002) ........................................................................ 34

*Bobula v. Dep't of Just.,*
970 F.2d 854 (Fed. Cir. 1992) ....................................................................... 29

*Boumediene v. Bush,*
553 U.S. 723 (2008) ................................................................................. 28

*Cabrera v. Dep't of Lab.,*
Civ. A. No.25-1909 (DLF), 2025 WL 2556571 (D.D.C. Aug. 11, 2025) .............................. 20

*Campaign Legal Ctr. v. Correct the Rec.,*
Civ. A. No. 23-0075 (JEB), 2023 WL 2838131 (D.D.C. Apr. 7, 2023) .............................. 22

*Cayuga Nation v. Zinke,*
302 F. Supp. 3d 362 (D.D.C. 2018) ................................................................ 37

*Changji Esquel Textile Co. v. Raimondo,*
40 F.4th 716 (D.C. Cir. 2022) ...................................................................... 29

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ............................................................. 14, 36, 37

*Cobell v. Jewell*,
Civ. A. No. 96-1285 (TFH), 2016 WL 10704595 (D.D.C. Mar. 30, 2016) .......................... 17

*Cole v. Young*,
351 U.S. 536 (1956) ......................................................................................................... 30

*Crowe v. Fed. Bureau of Prisons*,
Civ. A. No. 24-3582 (APM), 2025 WL 3516114 (D.D.C. Jan. 17, 2025) ........................... 18

*Ctr. for Biological Diversity v. EPA*,
274 F.R.D. 305 (D.D.C. 2011) ......................................................................................... 20

*Deutsche Bank Nat'l Trust Co. v. FDIC*,
717 F.3d 189 (D.C. Cir. 2013) ......................................................................................... 12

*Dize v. Amalgamated Council of Greyhound Loc. Unions*,
684 F. Supp. 332 (D.D.C. 1988) ....................................................................................... 18

*Elgin v. Dep't of the Treas.*,
567 U.S. 1 (2012) ........................................................................................................ 27-28

*Envtl. Def. Fund, Inc. v. Higginson*,
631 F. 2d 738 (D.C. Cir. 1979) ......................................................................................... 18

*Fed. Educ. Ass'n v. Trump*,
795 F. Supp. 3d 74 (D.D.C. Aug. 14, 2025) .................................................................. 3, 33

*Fed. Educ. Ass'n v. Trump*,
No. 25-5303, 2025 WL 2738626 (D.C. Cir. Sept. 25, 2025) ............................................. 3

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ......................................................................................................... 24

*Friends of Earth v. Haaland*,
Civ. A. No. 21-2317 (RC), 2022 WL 136763 (D.D.C. Jan. 15, 2022) ................................ 19

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ............................................................................................. 34

*Harrison v. Off. of Architect of Capitol*,
68 F. Supp. 3d 174 (D.D.C. 2014) .................................................................................... 33

*Hudson v. Am. Fed'n of Gov't Emps.*,
No. 24-7077, 2024 WL 4248501 (D.C. Cir. Sept. 18, 2024) ............................................. 17

*Institutional Shareholder Servs. v. SEC*,
142 F.4th 757 (D.C. Cir. 2025) ......................................................................................... 12

*Jolley v. United States*,
Civ. A. No. 21-2709 (TSC), 2023 WL 3619415 (D.D.C. May 24, 2023) ............................ 35

*Love v. Vilsack*,
   304 F.R.D. 85 (D.D.C. 2014) ..................................................................................... 21

*Nat'l Treas. Emps. Union v. Trump*,
   780 F. Supp. 3d 237 (D.D.C. 2025) .......................................... 2, 28, 30, 32-33, 33

*Nat'l Treas. Emps. Union v. Trump*,
   No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ...................................... 3, 38, 39

*Nat'l Council of Agr. Emp'rs v. Dep't of Lab.*,
   Civ. A. No. 22-3569 (RC), 2023 WL 2043149 ....................................................... 23

*Nat'l Vets. Legal Servs. Program v. United States*,
   Civ. A. No. 16-0745 (PLF), 2021 WL 5332029 (D.D.C. Nov. 16, 2021) ............................ 13

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................................ 14, 38

*Scholz v. United States*,
   18 F.4th 941 (7th Cir. 2021) ................................................................................ 35

*Scottsdale Capital Advisors Corp. v. Fin. Indus. Regul. Auth. Inc.*,
   678 F. Supp. 3d 88 (D.D.C. 2023) ........................................................................ 14

*SCPS, LLC v. Law*,
   770 F. Supp. 3d 11 (D.D.C. 2025) ........................................................................ 24

*Sidberry v. Koch*,
   539 F. Supp. 413 (S.D.N.Y. 1982) .................................................................... 19-20

*Steele v. United States*,
   144 F.4th 316 (D.C. Cir. 2025) ............................................................................ 35

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ............................................................................................ 25

*United Mexican States v. Lion Mexico Consol., L.P.*,
   757 F. Supp. 3d 18 (D.D.C. 2024) ........................................................................ 15

*United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*,
   45 F.4th 426 (D.C. Cir. 2022) .............................................................................. 17

*United States v. Google LLC*,
   Civ. A. No. 20-3010 (APM), 2025 WL 372072 (D.D.C. Jan. 27, 2025) .............................. 15

*United States v. Ruiz*,
   536 U.S. 622 (2002) ............................................................................................ 28

*Whitman-Walker Clinic, Inc. v. Dep't of Health & Hum. Servs.*,
   Civ. A. No. 20-1630 (JEB), 2021 WL 4033072 (D.D.C. Sept. 3, 2021) ......................... 13, 21

*Widakuswara v. Lake*,
No. 25-5145, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ...................................................... 39

*Wilderness Soc'y v. Trump*,
Civ. A. No. 17-2587 (TSC), 2024 WL 4880449 (D.D.C. Nov. 25, 2024) ............................. 22

*Williams v. NASA*,
Civ. A. No. 26-0564 (CRC), 2026 WL 1162715 (D.D.C. Apr. 29, 2026) ........... 11, 12, 13, 37

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................................................................. 13

**Statutes**

5 U.S.C. § 7103 ........................................................................ 2, 7, 8, 9, 26, 32, 34, 38

5 U.S.C. § 7105 ................................................................................................. 28, 34

5 U.S.C. § 7111 ......................................................................................................... 26

5 U.S.C. § 7116 ............................................................................................. 24, 26, 28

5 U.S.C. § 7118 ................................................................................................. 24, 26

5 U.S.C. § 7121 ......................................................................................................... 25

5 U.S.C. § 7122 ............................................................................................. 25, 26, 30

5 U.S.C. § 7123 ................................................................................................. 25, 26

41 U.S.C. § 4713 ....................................................................................................... 32

42 U.S.C. § 18445 ..................................................................................................... 31

51 U.S.C. § 20102 ................................................................................................. 29, 31

51 U.S.C. § 20132 ..................................................................................................... 31

51 U.S.C. § 40102 ..................................................................................................... 32

51 U.S.C. § 50116 ..................................................................................................... 32

51 U.S.C. § 70501 ..................................................................................................... 31

51 U.S.C. § 20114 ..................................................................................................... 31

51 U.S.C. § 20304 ..................................................................................................... 31

National Aeronautics and Space Act of 1958,
Pub. L. 85-568, 72 Stat. 426, 429, 432 ............................................................................. 30–31

National Aeronautics and Space Administration Authorization Act of 2008,
Pub. L. 110-422, 122 Stat. 4779 (Oct. 15, 2008) ................................................................. 32

National Aeronautics and Space Administration Authorization of 2010,
Pub. L. 111-267, 124 Stat. 2805, 2844 ................................................................................. 31

**Regulations**

5 C.F.R. § 2423.3 ..................................................................................................... 24

5 C.F.R. § 2423.4 ..................................................................................................... 24

90 Fed. Reg. 14,553 ........................................................................................................... 2

90 Fed. Reg. 42,683 ............................................................................... 3, 4, 16, 33, 34

Defendants, President Donald Trump and National Aeronautics and Space Administration ("NASA") Administrator Jared Isaacman (collectively, "Defendants"), respectfully submit this opposition to non-party Goddard Engineers, Scientists, and Technicians Association/IFPTE Local 29's ("Local 29") Emergency Motion to Intervene, to Modify the Stay, and for Temporary Restraining Order and Preliminary Injunction.

Local 29's effort to intervene in this case is based on an alleged breach of a 2012 Settlement Agreement between NASA and itself in December 2025. But, Local 29 already sought relief from a court in this District, in *Williams v. NASA*, Civ. A. No. 26-0564 (CRC) (D.D.C. filed Feb. 19, 2026), asking for the same relief it does here: preventing NASA from completing the consolidation of library materials. In that case, Local 29 deliberately declined to seek enforcement of the Settlement Agreement. Having failed to obtain the result it wanted from the first court, it now comes here and seeks to assert the legal theory that it strategically held in reserve. Contending that its failure in the first court represents an emergency, Local 29 seeks to hijack this existing litigation and demand virtually the same emergency injunctive relief that it sought, while the existing parties seemingly agree with the Court's decision to stay this case until the D.C. Circuit decides issues critical to the parties' dispute.

For reasons discussed below, Local 29's interests are fully represented by the national union, Plaintiff International Federation of Professional & Technical Engineers ("Plaintiff" or "IFPTE"), Local 29 fails to show a change in circumstances warranting a modification of the stay, and Local 29 cannot show an irreparable injury, likelihood of success on the merits, or that the balance of the equities weighs in its favor. Therefore, the Court should deny Local 29's motion in all respects.

## BACKGROUND

### I.    Unions Challenge Executive Order 14,251

Under 5 U.S.C. § 7103(b), "[t]he President may issue an order excluding any agency or subdivision thereof from coverage" under the Federal Service Labor-Management Relations Statute ("FSLMRS") "if the President determines that-- (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."

On March 27, 2025, President Trump signed Executive Order 14,251, which excluded numerous agencies from the scope of the FLSMRS. *See Exclusions from Federal Labor-Management Relations Programs*, 90 Fed. Reg. 14,553 (Mar. 27, 2025). Numerous unions challenged this executive order in courts across the country. Three cases are particularly relevant to this case.

First, in *National Treasury Employees Union v. Trump*, 780 F. Supp. 3d 237 (D.D.C. 2025), on April 28, 2025, this Court granted a plaintiff union's motion for a preliminary injunction against Executive Order 14,251. In doing so, this Court concluded that it had jurisdiction over the case, and that the plaintiff union had shown a likelihood of success that Executive Order was ultra vires. In particular the Court paid close attention to "the breadth of the Executive Order" because "the order strips collective bargaining rights from two-thirds of the federal workforce" and the Court concluded "the President has applied an overly broad interpretation of 'national security' when invoking Section 7103(b)(1)[.]" *Id.* at 255, 262.

Second, the next month, this Court granted a preliminary injunction in favor of another union with respect to the same executive order in *American Foreign Service Association v. Trump*, 783 F. Supp. 3d 248 (D.D.C. 2025). In *American Foreign Service Association*, this Court looked

to its *National Treasury Employees Union* ruling and determined, among other things, that it had jurisdiction to hear the case and that the plaintiff union had shown a likelihood of success that Executive Order 14,251 was ultra vires "for the same reasons" a in *National Treasuries Employees Union*.  783 F. Supp. 3d 248, 261, 264 (2025).

Third, in *Federal Education Association v. Trump*, 795 F. Supp. 3d 74, 83–84, 97–98 (D.D.C. Aug. 14, 2025), this Court determined that it had jurisdiction over the plaintiffs' challenge for the reasons "explained at length in *NTEU* and again in *AFSA*" and "[f]or the reasons explained in *NTEU*," the Court determined that plaintiffs were likely to succeed in showing that the entirety of Executive Order 14,251 was ultra vires.

The defendants in those cases all appealed.  On May 16, 2025, a panel of the D.C. Circuit granted a stay pending appeal in *National Treasury Employees Union v. Trump*, No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025).  Similarly, on June 20, 2025, a different panel granted a stay pending appeal in *American Foreign Service Association v. Trump*, No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025).  Finally, in *Federal Education Association v. Trump*, No. 25-5303, 2025 WL 2738626 (D.C. Cir. Sept. 25, 2025), a panel of the court denied a stay pending appeal.  Argument was held on all three cases on December 15, 2025, but, as of June 1, 2026, the D.C. Circuit has not issued a decision in any of these three cases.

## II.    The President Signs Executive Order 14,343

On August 28, 2025, President Trump signed Executive Order 14,343, which removed NASA certain other agencies from coverage under the FSLMRS.  Exec. Order 14,343 § 2(c), 90 Fed. Reg. 42,683, 42,683.

That same day, the White House issued a "Fact Sheet" explaining the national security missions of NASA and the other agencies or components. *Fact Sheet: President Donald J. Trump Exempts Agencies With National Security Missions from Federal Collective Bargaining*

*Requirements*, White House (Aug. 28, 2025), *available at* https://www.whitehouse.gov/fact-sheets/2025/08/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements-6a95/.  With respect to NASA, the White House wrote, "NASA develops and operates advanced air and space technologies, like satellite, communications, and propulsion systems, that are critical for U.S. national security." *Id.*

### III.    IFPTE, the National Union for Local 29, Files This Action

On October 7, 2025, Local 29 released a blog post stating, "IFPTE is considering litigation against the administration and the Executive Order (EO) which categorized NASA as a national security agency and abrogated GESTA's and other NASA employee unions' bargaining rights." *Update on IFPTE Legal Action on Union Rights*, GESTA IFPTE Local 29 (Oct. 7, 2025), https://www.gesta-goddard.org/blog/update-on-ifpte-legal-action-on-union-rights.

The next day, on October 8, 2025, Plaintiff IFPTE filed this lawsuit "challeng[ing] President Trump's Executive Order No. 14343."  Compl. ¶ 2.  Plaintiff explained that it "is a national labor organization whose local unions serve as the bargaining representatives" at NASA—"[s]pecifically, IFPTE Local 9," "IFPTE Local 27," "IFPTE Local 28," "IFPTE Local 30," and proposed intervenor Local 29.  Compl. ¶ 10.  Shortly thereafter, Local 29 issued a blog post, entitled "IFPTE Lawsuit Filed on Behalf of NASA Unions." *IFPTE Lawsuit Files on Behalf of NASA Unions* (Nov. 1, 2025), https://www.gesta-goddard.org/blog/ifpte-lawsuit-filed-on-behalf-of-nasa-unions.

Plaintiff's counsel noticed that this case is related to, among other cases, *Nat'l Treas. Employees Union v. Trump*, Civ. A. No. 25-1030 (PLF) (D.D.C.); *Am. Foreign Service Ass'n v. Trump*, Civ. A. No. 25-1030 (PLF) (D.D.C.); and *Fed. Educ. Ass'n v. Trump*, Civ. A. No. 25-1362 (PLF) (D.D.C.), all of which, as noted above, are under appeal.  *See* Not. of Related Case at 2, ECF No. 6; *National Treasury Employees Union v. Trump*, No. 25-5157 (D.C. Cir.), *American*

- 4 -

*Foreign Service Ass'n v. Trump*, No. 25-5184 (D.C. Cir.), and *Federal Education Ass'n v. Trump*, No. 25-5303 (D.C. Cir.)[.]"

As a result, this case was reassigned to this Court (Order, ECF No. 11), and the Court issued a stay "[i]n light of the D.C. Circuit's anticipated decision(s) in National Treasury Employees Union v. Trump, No. 25-5157 (D.C. Cir.), American Foreign Service Ass'n v. Trump, No. 25-5184 (D.C. Cir.), and Federal Education Ass'n v. Trump, No. 25-5303 (D.C. Cir.)." Dec. 22, 2025, Min. Order. Plaintiff did not oppose the stay.

## IV.    Technological Developments Have Limited the Need for the Goddard Library

NASA carries out its scientific, engineering, and operational missions across approximately twenty facilities located throughout the United States. *See* Gary Willis Declaration ¶¶ 4–6, *Williams v. NASA*, Civ. A. No. 26-0564 (CRC) (D.D.C. Mar. 11, 2026), ECF No. 8-2 ("Willis *Williams* Decl.").[1]  One of those facilities is the Goddard Space Flight Center in Greenbelt, Maryland, established in 1959 and long recognized as one of NASA's premier spaceflight complexes. *Id*. Among its many functions, Goddard has historically maintained a research library (the "Goddard Library") containing more than 100,000 publications available for employees to consult in support of NASA's scientific and technical work. *See* Compl. ¶ 55, *Williams v. NASA*, *supra*, ECF No. 1.

Over time, however, the way NASA personnel access scientific information has evolved. Willis *Williams* Decl. ¶¶ 8–9. As research resources have increasingly migrated to digital platforms, NASA employees have relied less on physical library collections and more on electronic databases, digital repositories, and remote research services. *Id*. This shift reflects broader trends

---

[1]    The Willis *Williams* Declaration was later re-filed with a signature at *Williams*, *supra*, ECF No. 18-1.

across the federal government and the scientific community toward digital access to research materials. *Id*.

At the same time, maintaining large physical collections and dedicated library facilities requires the expenditure of public funds and the use of valuable real property. *Id*. ¶ 10. Federal agencies must continually evaluate whether physical space is being used in the most efficient manner possible. *Id*. To ensure that its infrastructure supports future mission needs while remaining fiscally responsible, NASA—like other agencies—engages in long-term facilities planning. *Id*. ¶ 11; Declaration of Raymond Rubilotta ¶ 14, *Williams*, *supra*, ECF No. 8-3 ("Rubilotta *Williams* Decl.").

Consistent with government-wide initiatives to reduce excess real property, including the Office of Management and Budget's National Strategy for the Efficient Use of Real Property and its "Reduce the Footprint" policy, NASA directed each center to develop master plans for its facilities. Rubilotta *Williams* Decl. ¶¶ 16, 20. Those plans were designed to achieve sustainable and affordable infrastructure over approximately a twenty-year horizon through 2038 and were reviewed by NASA's Mission Support Council. *Id*. Within this framework, NASA retains discretion to manage and repurpose facilities to align physical infrastructure with evolving operational and technological realities. *Id*. ¶ 22.

## V.    NASA Concludes the 2012 Settlement Agreement Does Not Apply

Before 2025, planning for Goddard facilities did not include closure or consolidation of the Goddard Library because of a 2012 settlement agreement of a Federal Labor Relations Authority case between NASA and Local 29 resolving an unfair labor practice charge filed on April 27, 2012. *See* Rubilotta *Williams* Decl. ¶¶ 6–12; Compl. ¶¶ 58–59; *see generally* Settlement Agreement, ECF No. 13-4. Under that agreement, NASA agreed to maintain a collection of "physical library resources" at the Goddard Library and to ensure the continued availability of

- 6 -

multifunction space.  Settlement Agreement ¶ 1(a).  The agreement also required NASA to notify Local 29 regarding "proposed changes to working conditions."  *Id*. ¶ 1(d)

In August 2025, however, as noted above, President Trump issued Executive Order 14,343, which excluded NASA from the provisions of the FSLMRS.  *See* 5 U.S.C. § 7103(b).  Following issuance of the Executive Order, NASA determined that facilities planning decisions—including those affecting the Goddard Library—could proceed without the constraints imposed by the 2012 Settlement Agreement.  Rubilotta *Williams* Decl. ¶ 21.

Around this time, both Local 29 and Plaintiff complained about NASA's facilities decisions at the Goddard Space Flight Center.  In September 2025, Local 29 stated that it was concerned about building closures, but, "[d]ue to Executive Order 14343, management is no longer recognizing [Local 29's] Collective Bargaining Agreement" and negotiations with management about Goddard's facilities consolidation efforts "have been halted."  *Building Closures Guidance*, GESTA IFPTE Local 29, https://www.gesta-goddard.org/blog/building-closures-and-moving-guidance (Sept. 29, 2025).  In November, Local 29 and Plaintiff issued a joint "issue brief" protesting decisions to close buildings and relocate program offices at Goddard.  *NASA Goddard Is Destroying Strategic Capabilities Needed for NASA Missions By Closing Buildings and Divesting Labs*, GESTA and IFPTE (Nov. 14, 2025), https://www.gesta-goddard.org/uploads/4/0/5/6/40565251/gestaifptegoddardbuildingclosuresbrief11_14_25.pdf.

In early December 2025, NASA suspended operations at the Goddard Library and initiated a sixty-day assessment of the collection to determine what materials should be retained, archived, digitized, or otherwise dispositioned.  *Williams* Compl. ¶ 64; *see* Ex. A.  The assessment was conducted from December 5, 2025, through January 30, 2026, by a team including four professionally trained librarians with assistance from the NASA Chief Archivist.  Willis *Williams*

Decl. ¶¶ 25–28.  The assessment followed a management decision to consolidate the Goddard Library's collection into a single, agency-wide library, which NASA had previously done at other centers.  *See* Willis *Williams* Decl. ¶ 11; Rubilotta *Williams* Decl. ¶ 25.  NASA intended to reallocate the library space for other agency purposes as part of a revised Goddard Master Plan. *See* Eric Niiler, *NASA's Largest Library Is Closing Amid Staff and Lab Cuts*, N.Y. Times (Dec. 31, 2025) ("The changes were part of a long-planned reorganization that began before the Trump administration took office, [NASA spokeswoman Bethany Stevens] said.").

On December 27, 2025, Local 29 articulated the position that closure of the library was "in direct violation of a 2012 Negotiated Settlement Agreement between GESTA and NASA Goddard."  *Building Closure Updates*, GESTA IFPTE Local 29 (Dec. 27, 2025), https://www.gesta-goddard.org/blog/building-closure-updates.

On January 7, 2026, Plaintiff also announced its opposition to NASA's decision to close the Goddard Library.  *IFPTE Responds to NASA Administrator Isaacman's Misleading and Misguided Explanation for Closing NASA's Largest Research Library*, IFPTE (Jan. 7, 2026), https://www.ifpte.org/news/ifpte-responds-to-nasa-administrator-isaacmans-misleading-and-misguided-explanation-for-closing-nasas-largest-research-library.

## VI.    NASA Has Been Consolidating Material

NASA has "box[ed] up the materials held in the Goddard Library collection and emptied out the space."  Willis Decl. ¶ 6.  The materials were planned to be sent to four different locations/custodians: (1) NASA's Chief Archivist; (2) the NASA STI Repository; (3) NASA's Glenn Research Center in Cleveland, Ohio; and (4) the General Services Administration ("GSA"). *Id.* ¶¶ 8–11.  Specifically, the material NASA plans to keep in its library is being consolidated with the existing collection at NASA's Glenn Research Center while part of the "excess" material has been sent to GSA.  *Id.* ¶¶ 10–11.  NASA has undertaken costs with respect to the expected transfer

to library consolidation at the Glenn Research Center by shipping supplemental shelving units, reinforcing the floor, and hiring staff. *Id.* ¶ 10.

The material to be sent to GSA has been the focus of Local 29's litigation. In *Williams*, NASA agreed to stay certain activities through April 30, 2026. *See* Local 29's Mot. at 4 ("NASA later agreed to pause shipments to GSA only until at least April 30, 2026."). In response to this litigation, Defendants again agreed not to send material to GSA for disposition for a limited period of time. *See* May 11, 2026, Jt. Status Rep at 2, ECF No. 19 ("Defendants have further represented that they will not make any further dispositions to the U.S. General Services Administration through June 30, 2026."); Rubilotta Decl. ¶ 7.

## VII.    Local 29 Files the *Williams* Action and Loses on its Motion for a Preliminary Injunction

On February 19, 2026, Local 29 filed suit against NASA, the NASA Administrator, and the Acting Archivist, in part seeking "to vacate and rescind the decision to permanently close the Goddard Library." *See* Compl. ¶ 10, *Williams*, *supra*, ECF No. 1.[2] Local 29 was represented by the same counsel representing them in the instant motion. In *Williams*, Local 29 sought to "[e]njoin destruction, disposal, dispersal, or other irreversible separation of records and materials housed at the Goddard Library" based on the Federal Records Act, the Administrative Procedure Act, and an ultra vires theory. *See* Compl. ¶¶ 79–139, *Williams, supra*; *id.* (Prayer for Relief) ¶ c. The *Williams* Complaint invoked the Settlement Agreement as evidence for Local 29's claims, but Local 29 expressly declined to seek enforcement of the Settlement Agreement, even though Local 29 had declared that closing the library breached Settlement Agreement nearly two months earlier. *Id.* ¶¶ 58–59, 111–113 ("Plaintiffs do not seek enforcement of the 2012 Settlement Agreement as

---

[2]    Local 29 had two co-plaintiffs in *Williams*: (1) David Williams, a planetary scientist (Compl. ¶ 2, *Willaims*, *supra*), and (2) Giovanni De Amici, a member of Local 29 (*id.* ¶¶ 30–31).

a labor contract; rather, the 2012 Settlement Agreement is relevant evidence of NASA's prior institutional position and settled practices, the reliance interests it generated, and the agency's failure to provide a reasoned explanation for departure from those commitments."); *Building Closure Updates*, GESTA IFPTE Local 29 (Dec. 27, 2025), https://www.gesta-goddard.org/blog/building-closure-updates. Local 29 also declined to challenge the Executive Order that had rendered the Settlement Agreement unenforceable. *See generally* Compl., *Williams*.

One week later, Local 29 filed an "Emergency Motion for a Temporary Restraining Order." *See* Emergency Mot., *Williams*, *supra*, ECF No. 3. In that motion, Local 29 sought, among other things, to "restrain[] and preliminarily enjoin[] NASA from enforcing or implementing the permanent closures of the Goddard Library." Emergency Mot. at 2, *Williams*, *supra*. As with the *Williams* Complaint, Local 29, citing a declaration by Local 29's president, mentioned the Settlement Agreement, but expressly disclaimed the request "to enforce the 2012 Settlement Agreement as a labor contract." Emergency Mot. at 10–11, *Williams*, *supra* ECF No. 3; *see also* Moton Decl. ¶¶ 19–23, *Williams*, *supra*, ECF No. 3-2 (implying that closing the library would breach the Settlement Agreement).

On March 11, 2026, Defendants filed their opposition to Local 29's "Emergency Motion." Defendants explained forthrightly that "NASA determined" it could make its decision about the Goddard Library without regard to the Settlement Agreement after Executive Order 14,343. Opp'n at 5–6, *Williams*, *supra*, ECF No. 8 (citing Rubilotta William Decl. ¶ 21). The *Williams* defendants further argued that, although Local 29 disclaimed that it was enforcing the Settlement Agreement, Local 29's emergency motion essentially sought to enforce the Settlement Agreement. *Id.* at 13 ("[T]he practical effect of the requested injunction would be to enforce the continued operation of

- 10 -

a physical library collection at Goddard and thereby compel performance of the settlement's terms.").

Local 29's March 23, 2026, reply showed that Local 29 understood that NASA had relied on Executive Order 14,343, to determine that the Settlement Agreement no longer bound NASA. *See* Reply at 2, *Williams*, *supra*, ECF No. 10) (recognizing that NASA's declarant "concluded that the 2012 Settlement Agreement no longer constrained management's choices").

On April 29, 2026, the district court denied Local 29's "Emergency Motion" for a preliminary injunction. The district court noted that NASA explained that it closed the library in reliance on Executive Order 14,343. *Williams v. NASA*, Civ. A. No. 26-0564 (CRC), 2026 WL 1162715, at *4 (D.D.C. Apr. 29, 2026). The district court then explained that Local 29's motion failed because it had "not established irreparable harm arising from the Goddard Library's closure." *Id.* at *7. Local 29 and its co-plaintiffs "had not explained how NASA's plans to repurpose the Goddard Library space would cause irreparable harm if they could still access the materials that were once housed there." *Id.*

## VIII.    Local 29 Files the Instant Motion, Seeking Much the Same Relief It Sought Unsuccessfully in *Williams*

Two days after Local 29 lost its emergency motion for a preliminary injunction to prevent the Goddard Library from closing and 125 days after first publicly asserting that the closure violated the terms of the 2012 Settlement Agreement, Local 29 filed the instant emergency motion to intervene, lift the stay, and for a preliminary injunction to prevent the Goddard Library from closing. *Williams*, 2026 WL 1162715, at *4; Local 29's Mot., ECF No. 13.

Local 29's proposed complaint brings two causes of action. First, Local 29 argues that it was ultra vires for President Trump to include NASA in Executive Order 14,343 and to treat the Settlement Agreement as terminated. Prop. Compl. ¶¶ 21–25, ECF No. 13-1. Second, Local 29

- 11 -

argues that it was arbitrary and capricious for NASA to terminate the settlement agreement and "to preserve meaningful relief while the legality of" Executive Order 14,343 "remains unresolved." *Id.* ¶¶ 26–29.

Even though Local 29 expressly disclaimed seeking enforcement of the 2012 Settlement agreement in *Williams*, Local 29 asserts that it brought this motion because "Judge Cooper denied preliminary relief in *Williams* without deciding the EO/labor-agreement question." Local 29's Mot. at 7; *see also id.* at 9 ("The limited modification is warranted by changed circumstances: Judge Cooper has denied preliminary relief in *Williams* without deciding the EO/labor-agreement question.").

## LEGAL STANDARDS

### I.    Motion to Intervene

#### A.    Mandatory Intervention

Where an individual seeks to intervene as of right, it "must demonstrate: '(1) the application to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an adequate representative of the applicant's interests.'" *Deutsche Bank Nat'l Trust Co. v. FDIC*, 717 F.3d 189, 192 (D.C. Cir. 2013) (quoting *Karsner v. Lothian,* 532 F.3d 876, 885 (D.C. Cir. 2008)), *abrogated in part by Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020), *as recognized in Institutional Shareholder Servs. v. SEC*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025). "If the motion was not timely, there is no need for the court to address the other factors that enter into an intervention analysis." *Associated Builders & Contractors, Inc. v. Herman*, 166 F.3d 1248, 1257 (D.C. Cir. 1999)

### B.    Permissive Intervention

"The D.C. Circuit has articulated three requirements that a putative intervenor ordinarily must meet: '(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action.'" *Nat'l Vets. Legal Servs. Program v. United States*, Civ. A. No. 16-0745 (PLF), 2021 WL 5332029, at *4 (D.D.C. Nov. 16, 2021) (quoting *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998)).  "A court's decision pursuant to Rule 24(b) is discretionary and a district court may 'deny a motion for permissive intervention even if the movant establishe[s]' all three of these requirements." *Id.* (quoting *Nat'l Children's Ctr., Inc.*, 146 F.3d at 1048).

## II.    Motion to Stay

"A federal district court 'has broad discretion to stay proceedings as an incident to its power to control its own docket.'" *Whitman-Walker Clinic, Inc. v. Dep't of Health & Hum. Servs.*, Civ. A. No. 20-1630 (JEB), 2021 WL 4033072, at *1 (D.D.C. Sept. 3, 2021) (quoting *Clinton v. Jones*, 520 U.S. 681, 706 (1997)).  "Once a stay is imposed, the Court may lift it '[w]hen circumstances have changed such that the court's reasons for imposing the stay no longer exist or are inappropriate.'" *Id.* (quoting *Marsh v. Johnson*, 263 F. Supp. 2d 49, 52 (D.D.C. 2003)).

## III.    Motion for a Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Thus, "[a] temporary restraining order and preliminary injunction . . . should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion.'" *Williams*, 2026 WL 1162715, at *6 (quoting *Postal Police Officers Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 418 (D.D.C. 2020)).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

- 13 -

balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The moving party bears the burden of persuasion and must demonstrate "by a clear showing" that the requested relief is warranted. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). A "court must be persuaded as to all four factors." *Scottsdale Capital Advisors Corp. v. Fin. Indus. Regul. Auth. Inc.*, 678 F. Supp. 3d 88, 100 (D.D.C. 2023). The balance of equities and the public interest "factors merge when the Government is the opposing party." *See Nken v. Holder*, 556 U.S. 418, 435 (2009)

## ARGUMENT

Local 29's belated attempt to get a second bite at the *Williams* apple should be denied. Analytically, Local 29's motion consists of three tests stacked on top of each other.

First, the Court must, therefore, determine whether Local 29 can intervene before it can hear the rest of Local 29's arguments. Local 29 should not be allowed to intervene because its motion is not timely and because Plaintiff, Local 29's parent union, adequately represents Local 29's interests.

Then, the Court must determine whether to lift the stay before it can reach Local 29's emergency motion for a preliminary injunction to re-open the Goddard Library. Here, the reasons for the stay—the pendency of the appeals in *National Treasury Employees Union v. Trump*, No. 25-5157 (D.C. Cir. May 16, 2025), *American Foreign Service Association v. Trump*, No. 25-5184 (D.C. Cir. June 20, 2025), and *Federal Education Association v. Trump*, No. 25-5303 (D.C. Cir. Sept. 25, 2025)—have not changed.

Finally, even if the Court reached Local 29's second stab at an emergency motion preliminary relief, it should deny that motion because Local 29 seeks mandatory relief, and, as the *Williams* court determined, Local 29 fails to make the difficult showing necessary to obtain that relief.

- 14 -

I.      **Local 29's Motion to Intervene Should Be Denied**

      A.      **Local 29's Motion Is Not Timely**

Both a motion to intervene as of right and a motion to intervene permissively require that the proposed intervenor bring a "timely" motion. *United States v. Google LLC*, Civ. A. No. 20-3010 (APM), 2025 WL 372072, at *1 (D.D.C. Jan. 27, 2025) ("Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be 'timely.' If it is untimely, intervention must be denied." (quoting *NAACP v. New York*, 413 U.S. 345, 365 (1973))), *aff'd*, No. 25-5016, 2025 WL 880552 (D.C. Cir. Mar. 21, 2025). "The most important circumstance relating to timeliness is whether a party sought to intervene as soon as it became clear that its interests would no longer be protected by the parties in the case." *United Mexican States v. Lion Mexico Consol., L.P.*, 757 F. Supp. 3d 18, 33 (D.D.C. 2024) (quoting *Campaign Legal Ctr. v. Fed. Election 'Comm'n*, 68 F.4th 607, 610 (D.C. Cir. 2023)), *aff'd*, 172 F.4th 1 (D.C. Cir. 2026).

Local 29 does not identify when it learned that "its interests would no longer be protected by" Plaintiff. Instead, Local 29 identifies two points in time—neither of which relate to Plaintiff's ability to protect Local 29's interests. First, Local 29 looks to "when NASA relied on EO 14343 to treat the 2012 Settlement Agreement as no longer restraining management choices concerning the Goddard Library." Local 29's Mot. at 7. But NASA's decision occurred in December 2025, as Local 29 recognized contemporaneously. *See Building Closure Updates*, GESTA IFPTE Local 29 (Dec. 27, 2025), https://www.gesta-goddard.org/blog/building-closure-updates. Local 29's second event does appear to be the trigger for this litigation and does not relate to Plaintiff's adequacy to represent Local 29's interest: Local 29 points to "when Judge Cooper denied preliminary relief in *Williams*." Local 29's Mot. at 7.

It is clear that Local 29's motion is untimely because Local 29 sat on its rights to bring labor law arguments regarding the Settlement Agreement until it became dissatisfied with Judge Cooper's ruling in NASA's favor in *Williams*.  Executive Order 14,343 was signed on August 28, 2025.  90 Fed. Reg. 42,683.  Local 29's parent union filed the instant litigation on October 8, 2025.  *See* Compl.  Local 29 announced that closing the Goddard Library would be a breach of the agreement on December 27, 2025.  *See Building Closure Updates*, GESTA IFPTE Local 29 (Dec. 27, 2025), https://www.gesta-goddard.org/blog/building-closure-updates.  Local 29 filed a lawsuit, challenging the closure of the Goddard Library and asserting that the closure was contrary to the Settlement Agreement on February 9, 2026.  *See* Compl., *Williams*.  NASA confirmed that it determined it could close the Goddard Library in reliance on the Executive Order in its March 11, 2026, memorandum in opposition to Local 29's motion in *Williams*.  *See* Opp'n at 6, *Williams*, ECF No. 8 ("Following issuance of the Executive Order, NASA determined that facilities planning decisions— including those affecting the Goddard Library—could proceed without the constraints imposed by the 2012 Settlement Agreement.").

During this entire time, Local 29 was on notice that Executive Order 14,343 affected it and received repeated confirmation that NASA expected to consolidate the Goddard Library without regard to the Settlement Agreement.  Local 29 was well aware that Plaintiff had accepted the wisdom of the Court's stay.  Local 29's belated disappointment with its litigation strategy does not show that Plaintiff fails to represent Local 29's interests.

Local 29's belated intervention would prejudice both parties by forcing them to litigate the merits of an ultra vires claim about Executive Order 14,343, while a substantially similar issue is on appeal.

**B.      Mandatory Intervention Is Improper Here Because Local 29 Is Adequately Represented**

The Court should also deny mandatory intervention because Local 29's interests are adequately represented by Plaintiff.  It is Local 29's burden to "show[] that existing parties could not adequately represent" its interest.  *Hudson v. Am. Fed'n of Gov't Emps.*, No. 24-7077, 2024 WL 4248501, at *1 (D.C. Cir. Sept. 18, 2024).  All that Local 29 offers is that Plaintiff "may not" represent Local 29 because Plaintiff "seeks relief for federal labor rights across the NASA workforce" while Local 29 seeks relief "concerning the Goddard Library." Local 29 Mot. at 8.  Local 29's vague speculation is insufficient to show that Plaintiff may not adequately represent Local 29.

Both the broader relief "across the NASA workforce" and the revivification of the Settlement Agreement rely on the same legal predicate: the judicial nullification of Executive Order 14,343.  *See* Local 29 Mot. at 9 ("NASA has identified EO 14343 as the reason the 2012 Settlement Agreement no longer restrains its management choices.").  Therefore, this Court should start from "a presumption of adequate representation." *Cobell v. Jewell*, Civ. A. No. 96-1285 (TFH), 2016 WL 10704595, at *2 (D.D.C. Mar. 30, 2016) ("[A] presumption of adequate representation exists if both the intervenor and existing party have the same ultimate objective[.]"); *see also United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 F.4th 426, 432 (D.C. Cir. 2022) ("A would-be intervenor is adequately represented when she 'offer[s] no argument not also pressed by' an existing party.").  It is Local 29's burden to "rebut this presumption by demonstrating special circumstances that make the representation inadequate, such as 'adversity of interest, collusion, or nonfeasance.'" *Cobell*, 2016 WL 10704595, at *2.  Local 29 has not done so.

- 17 -

Nor has Local 29 "demonstrated that [it] would have asserted a different argument in representing" the union members. *Dize v. Amalgamated Council of Greyhound Loc. Unions*, 684 F. Supp. 332, 337 (D.D.C. 1988). Even when the distinction is framed by Local 29 (*see* Local 29 Mot. at 8), the relief that Local 29 seeks is a subset of the relief that Plaintiff seeks, necessarily reflecting the reality that Local 29 is a subset of Plaintiff. Indeed, because Local 29 is a sub-unit of Plaintiff, the Court should start from the "presumption of adequate representation" for that reason as well. *Envtl. Def. Fund, Inc. v. Higginson*, 631 F. 2d 738, 740 (D.C. Cir. 1979) (presumption that citizen of a state is represented by a state); *see Dize*, 684 F. Supp. at 337 ("It also seems beyond question that the [union] will seek to continue its representation of the [local union] and the [employees] they represent as well as other [workers]."); *cf. Crowe v. Fed. Bureau of Prisons*, Civ. A. No. 24-3582 (APM), 2025 WL 3516114, at *1 (D.D.C. Jan. 17, 2025) ("Courts often find that intervenors are adequately represented for purposes of Rule 24 where they are putative members of a class."). Plaintiff's Complaint clearly addresses the interests of its local affiliate unions and their members as well. *See* Compl. ¶¶ 50–57, 65, 76, 85 (alleging harms to local IFPTE chapters, including in relation to their CBAs). Local 29's bare assertion that Plaintiff's representation "may be" inadequate fails to show that representation is inadequate and therefore, fails to rebut the presumption, regardless of its basis.

Plaintiff and Local 29's public statements further dispel a claim that Plaintiff inadequately represents Local 29's interests. Local 29 wrote about Plaintiff's interest in this litigation and released a blog post about it before Plaintiff filed its complaint. *See Update on IFPTE Legal Action on Union Rights*, GESTA IFPTE Local 29 (Oct. 7, 2025), https://www.gesta-goddard.org/blog/update-on-ifpte-legal-action-on-union-rights. And during the course of this litigation, Local 29 and Plaintiff issued a joint "issue brief" protesting NASA's facilities

management decisions at Goddard and discussing the alleged impact of those decisions on Goddard employees. *See NASA Goddard Is Destroying Strategic Capabilities Needed for NASA Missions By Closing Buildings and Divesting Labs*, GESTA and IFPTE (Nov. 14, 2025), https://www.gesta-goddard.org/uploads/4/0/5/6/40565251/ gestaifptegoddardbuildingclosuresbrief11_14_25.pdf.

### C.    Permissive Intervention Is Unwarranted Here

The Court should deny permissive intervention as well because Local 29 is adequately represented, Local 29 would not add value to this litigation, and Local 29 has already initiated litigation to vindicate its alleged rights.

#### 1.    Local 29's Interests Are Already Adequately Represented

"In deciding how to exercise its discretion, the Court may also consider such factors as . . . the degree to which those interests are adequately represented by other parties[.]" *Friends of Earth v. Haaland*, Civ. A. No. 21-2317 (RC), 2022 WL 136763, at *2 (D.D.C. Jan. 15, 2022) (quoting *Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 18 (D.D.C. 2010)). As described above, Plaintiff plainly represents Local 29's interests adequately.

#### 2.    Local 29 Would Add Little to This Case

Additionally, courts consider "whether parties seeking intervention will significantly contribute to . . . the just and equitable adjudication of the legal question presented." *Friends of Earth*, 2022 WL 136763, at *2. Local 29 has not shown how it would add to the arguments that Plaintiff would present, nor could it. The application of Executive Order 14,343 to all NASA employees who were members of Plaintiff, including members of Local 29, is the same and all legal questions are the same. *See Sidberry v. Koch*, 539 F. Supp. 413, 418 (S.D.N.Y. 1982) ("As what is primarily at issue here is the constitutionality of an across-the-board housing policy, it is obvious that the proposed intervention would add little, if any, to the elucidation of the matter.

Thus permission to intervene is denied."); *see also Ctr. for Biological Diversity v. EPA*, 274 F.R.D. 305, 313 (D.D.C. 2011) (denying permissive intervention where "movants offer no more than conclusory assertions that their participation will be helpful"). Therefore, permissive intervention should be denied.

### 3. Local 29 Already Filed a Lawsuit to Vindicate Its Rights

Finally, the Court should deny Local 29's intervention because Local 29 has already brought suit seeking substantially the same relief. *See Cabrera v. Dep't of Lab.*, Civ. A. No. 25-1909 (DLF), 2025 WL 2556571, at *2 (D.D.C. Aug. 11, 2025) (denying to permissive intervention where the proposed intervenor "has already filed a separate lawsuit in this Court seeking the same relief"), *dismissed*, No. 25-5342, 2025 WL 4664741 (D.C. Cir. Dec. 9, 2025).

Local 29 appears to claim that it needs to intervene here because its other suit did not specifically rule on Local 29's dispute with Executive Order 14,343. *See* Local 29's Mot. at 4–5 ("Importantly, however, [in *Williams*,] the Court did not decide the validity of EO 14343 as applied to NASA, did not decide whether the 2012 Settlement Agreement remains enforceable, and did not decide whether NASA lawfully relied on EO 14343 to repudiate GESTA's settlement rights."). Local 29 knew that it believed that NASA's handling of the Goddard Library breached the Settlement Agreement but expressly disclaimed enforcement of the Agreement in the *Williams* case. *See Building Closure Updates*, GESTA IFPTE Local 29 (Dec. 27, 2025), https://www.gesta-goddard.org/blog/building-closure-updates ("The closure of the GSFC library is in direct violation of a 2012 Negotiated Settlement Agreement between GESTA and NASA Goddard."); Comp.¶ 112, *Williams*, *supra*, ECF No. 1 ("Plaintiffs do not seek enforcement of the 2012 Settlement Agreement as a labor contract[.]").

Local 29's decision not to put its alleged FSLMRS rights at issue in *Williams* was a strategic choice. The litigants in this case—and this Court—should not be burdened by Local 29's

regret about that choice.  *See Love v. Vilsack*, 304 F.R.D. 85, 91 (D.D.C. 2014) ("[I]t is apparent that its decision not to seek intervention earlier was a strategic choice to instead participate in the parallel *Pigford* litigation, a circumstance that weighs against intervention."), *aff'd*, No. 14-5185, 2014 WL 6725758 (D.C. Cir. Nov. 18, 2014).

## II.    Local 29's Motion to Modify the Stay Should Be Denied

"Once a stay is imposed, the Court may lift it '[w]hen circumstances have changed such that the court's reasons for imposing the stay no longer exist or are inappropriate.'"  *Whitman-Walker Clinic*, 2021 WL 4033072, at *1 (quoting *Marsh*, 263 F. Supp. 2d at 52).  Here, the Court stayed this case "[i]n light of the D.C. Circuit's anticipated decision(s) in National Treasury Employees Union v. Trump, No. 25-5157 (D.C. Cir.), American Foreign Service Ass'n v. Trump, No. 25-5184 (D.C. Cir.), and Federal Education Ass'n v. Trump, No. 25-5303 (D.C. Cir.)[.]"  Dec. 22, 2025, Min. Order; *accord* Local Mot. at 9 ("This case is stayed pending resolution of related D.C. Circuit proceedings concerning EO 14251 and EO 14343.").  The D.C. Circuit will determine the key issues, including the proper standard of review of the Executive Orders.  Those circumstances have not changed.

Local 29 claims the circumstances have changed because "Judge Cooper has denied preliminary relief in *Williams* without resolving the EO/labor-agreement issue" and NASA's "voluntary pause" as part of *Williams* "has expired."  Local 29 Mot. at 9.  In truth, Local 29's circumstances have not changed.  Before *Williams*, there was no court-ordered relief preventing Defendant from completing the consolidation of the Goddard Library's collection.  After *Williams*, the same state of play remains.  Nor did Local 29 have a reasonable expectation that Judge Cooper would "resolv[e] the EO/labor-agreement issue" because Local 29 deliberately withheld that issue in *Williams*.  Compl. ¶ 112, *Williams* ("Plaintiffs do not seek enforcement of the 2012 Settlement Agreement as a labor contract[.]").  In other words, Local 29's circumstances are the same now as

they were shortly after the stay was entered in this case. *See Building Closure Updates*, GESTA IFPTE Local 29 (Dec. 27, 2025), https://www.gesta-goddard.org/blog/building-closure-updates ("The closure of the GSFC library is in direct violation of a 2012 Negotiated Settlement Agreement between GESTA and NASA Goddard.").

Moreover, revoking the stay would unnecessarily expend the parties' and the Court's judicial resources. Local 29 claims that the Court's stay modification could be "narrow" because it would not "require this Court to decide the merits of the broader EO challenge immediately." Pl.'s Mot. at 9. But, as seen below, the issues relevant to this preliminary injunction are fully coextensive with the evaluation of the merits. *Cf.* Local 29's Mot. at 9 (asserting that a stay is warranted "while the legality of EO 14343 as applied to NASA remains unresolved"). Indeed, Local 29 argues that it "is likely to succeed on its claim that EO 14343 is ultra vires as applied to NASA." Local 29's Mot. at 10. Either Local 29 is required show it likely to prevail on the merits as with any other preliminary injunction or Local 29 seeks to avoid the instruction of *Winter*, and instead tries to rely entirely on its view that it suffers a unique irreparable injury. *Cf.* Local 29's Mot. at 9 (asserting without support that a stay is warranted because of the possibility of "irreversible harm").

With respect to the merits, "the pending proceedings in the [D.C.] Circuit are likely to settle or simplify the outstanding issues. As a result, lifting the stay is unlikely to make efficient use of court or party resources." *Wilderness Soc'y v. Trump*, Civ. A. No. 17-2587 (TSC), 2024 WL 4880449, at *2 (D.D.C. Nov. 25, 2024) (citation omitted). Moreover, "[t]he delay from a stay" remains relatively "slight" "because the Court here would be granting a stay only pending the outcome of a" related appeal. *Campaign Legal Ctr. v. Correct the Rec.*, Civ. A. No. 23-0075 (JEB), 2023 WL 2838131, at *3 (D.D.C. Apr. 7, 2023).

To the extent that the Court concludes that Local 29 shows a reason to lift the stay, it will invite parties in every other case stayed pending the same appeals to demand similar special treatment. *See, e.g.*, Compl. ¶ 51 (alleging ten forms of irreparable harm); Compl., *Int'l Bhd. of Elec. Workers*, Civ. A. No. 25-3826 (D.D.C. Oct. 30, 2025). ECF No. 1 (seeking injunctive relief); Mot. Prelim. Inj. at 37–41, *Nat'l Weather Serv. Serv. Emps. Org.*, Civ. A. No. 25-2947 (PLF) (D.D.C. Oct. 24, 2025), ECF No. 15 (alleging irreparable harm).

## III.    **Local 29's Motion for a Preliminary Injunction Should Be Denied**

The below analysis of Local 29's motion for an injunction tracks the analysis that would be conducted with respect to Plaintiff's entitlement to an injunction. In turn, as the Court impliedly recognized in its December 22, 2025 order to stay, the analysis of Plaintiff's entitlement to an injunction is largely similar to the *National Treasury Employees Union v. Trump*, No. 25-5157 (D.C. Cir.), *American Foreign Service Association v. Trump*, No. 25-5184 (D.C. Cir. June 20, 2025), and *Federal Education Association v. Trump*, No. 25-5303 (D.C. Cir. Sept. 25, 2025). Thus, the parties' arguments with respect to the preliminary injunction confirm the wisdom of maintaining the stay here.

### A.    **Likelihood of Success on the Merits**

As discussed above, Local 29 asserts, citing nothing, that the Court can avoid "decid[ing] the merits of the broader EO challenge" because Local seeks only "relief pending resolution of the EO's validity." Local 29's Mot at 9. But, however Local 29 characterizes the relief sought, it must make a clear showing of a likelihood of success on the merits. *See, e.g.*, *Nat'l Council of Agr. Emp'rs v. Dep't of Lab.*, Civ. A. No. 22-3569 (RC), 2023 WL 2043149, at *3 n.4 ("This falls far short of Plaintiff's burden to establish its likelihood of success on the merits as to this claim by a 'clear showing.'"). "The first factor a party must show to obtain a preliminary injunction—a likelihood of success on the merits—'includes demonstrating a likelihood of successfully

establishing jurisdiction.'" *SCPS, LLC v. Law*, 770 F. Supp. 3d 11, 31 (D.D.C. 2025) (quoting

*Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 12–13 (D.D.C. 2024)).

> 1.    The Court Lacks Subject Matter Jurisdiction over Local 29's Claim that NASA Breached a Labor Law Settlement Agreement

"[W]hen Congress creates procedures designed to permit agency expertise to be brought

to bear on particular problems," those procedures are generally intended "to be exclusive." *Free*

*Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Whitney Nat.*

*Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.,* 379 U.S. 411, 420 (1965))

(quotation marks omitted).  Here, Congress enacted the FLSMRS as part of the Civil Service

Reform Act of 1978 ("CSRA)" to govern labor relations between the Executive Branch and its

employees. *See* Civil Service Reform Act of 1978, Pub. L. 95-454, tit. VII, 92 Stat. 1111, 1191–

1218 (Oct. 13, 1978).

With the FSLMRS, as with the rest of the CSRA, "Congress passed an enormously

complicated and subtle scheme to govern employee relations in the federal sector," along with

dedicated mechanisms for resolving federal labor disputes. *Am. Fed. of Gov't Emps. v. Secretary*

*of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (quoting *Steadman v. Gov., U.S. Soldiers' &*

*Airmen's Home*, 918 F.2d 963, 967 (D.C. Cir. 1990)) (quotation marks omitted).  The FSLMRS

establishes a dedicated mechanism for resolving labor disputes.  An employee or union may file a

charge with the Federal Labor Relations Authority ("FLRA") alleging that an agency has engaged

in an unfair labor practice, which can include, inter alia, a failure to negotiate in good faith or

comply with any FSLMRS provision.  *See* 5 U.S.C. § 7116 (unfair labor practices); 5 C.F.R.

§§ 2423.3–4.  The FLRA's General Counsel "shall investigate" any such charge and may file a

complaint against the agency before the FLRA.  *See* 5 U.S.C. § 7118(a)(1)–(2).  Under the statutory

scheme, an employee or union may also file a grievance through procedures that all collective-

- 24 -

bargaining agreements must include, culminating in an arbitration that can be appealed to the FLRA. *See* 5 U.S.C. §§ 7121–7122. With certain exceptions, an FLRA final order is subject to judicial review in a court of appeals. 5 U.S.C. § 7123(a).

The D.C. Circuit has held that review scheme "provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims" and unions "cannot circumvent this regime by instead bringing a suit in district court." *Am. Fed. of Gov't Emps.*, 716 F.3d at 637–38. This Court thus lacks jurisdiction to review Local 29's claims alleging that the government has acted contrary to the provisions of the FSLMRS, unless those claims are not "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994); *see Am. Fed. of Gov't Emps. v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) ("Congress intended the [FSLMRS] scheme to be exclusive with respect to claims within its scope."). In determining whether the claims presented here fit within the statutory review scheme, the Court must consider three factors: (1) whether "a finding of preclusion could foreclose all meaningful judicial review"; (2) whether the claims are "wholly collateral" to the FSLMRS's review provisions; and (3) whether the claims are "outside the [FLRA's] expertise." *Thunder Basin*, 510 U.S. at 212–13 (quotation marks omitted); *see also Am. Fed. of Gov't Emps.*, 929 F.3d at 755 (describing the three *Thunder Basin* factors). "The ultimate question is how best to understand what Congress has done—whether the statutory review scheme . . . reaches the claim in question." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023).

Each of the three *Thunder Basin* factors weighs in favor of finding Local 29's claims precluded. First, requiring Local 29 (or Plaintiff) to proceed through the statutory review scheme would not foreclose all meaningful judicial review. For example, Local 29 may challenge the

- 25 -

President's authority to exclude NASA from FSLMRS coverage pursuant to 5 U.S.C. § 7103(b)(1), *see* Proposed Compl. ¶¶ 21–25, ECF No. 13-1, through a decertification petition or a unit-clarification petition pursuant to 5 U.S.C. § 7111(b).  Local 29 can also litigate its claims through the statutory scheme by alleging that NASA has committed an unfair labor practice by "refus[ing] to consult or negotiate in good faith with a labor organization as required by" the FSLMRS or "otherwise fail[ing] or refus[ing] to comply with any provision" of the statute, 5 U.S.C. § 7116(a)(5), (8).  Local 29 could filed a charge with the FLRA's General Counsel, 5 U.S.C. § 7118(a), or raise its claim through the grievance and arbitration procedures and then appeal any adverse arbitrator's award to the FLRA, 5 U.S.C. § 7122(a).  Either way, Local 29 could obtain judicial review of an adverse FLRA decision in the court of appeals.  *See* 5 U.S.C. § 7123(a); *see also Am. Fed. of Gov't Emps.*, 929 F.3d at 757–58 (identifying ways a union could obtain judicial review of constitutional challenges to executive orders through the FSLMRS review scheme, including by filing unfair-labor-practice proceedings).

Second, Local 29's claim is not wholly collateral to the FSLMRS's statutory review scheme.  Local 29 saw issues about the Goddard Library as an issue of "employees' working conditions" proper subject to collective bargaining.  *See Building Closures Guidance*, GESTA IFPTE Local 29 (Sept. 29, 2025), https://www.gesta-goddard.org/blog/building-closures-and-moving-guidance ("GESTA had previously met and bargained in good faith with Center management on building moves given they constitute changes in employees' working conditions."); *Building Closures Guidance*, GESTA IFPTE Local 29, https://www.gesta-goddard.org/blog/building-closures-and-moving-guidance (Sept. 29, 2025) ("[d]ue to Executive Order 14343, management is no longer recognizing [Loal 29's] Collective Bargaining Agreement" and negotiations with management about Goddard's facilities consolidation efforts "have been

halted[]”).  And Local 29’s argument that the President’s invocation of § 7103(b)(1)—a provision within the FSLMRS—is invalid goes to the heart of the FSLMRS itself. Such challenges must be channeled through the FSLMRS’s contemplated means of enforcing labor rights (*e.g.*, unfair labor practice charges, grievances, unit-clarification petitions, etc.).

Similarly, Local 29 has made clear that it sees the consolidation of Goddard Library as a violation of the Settlement Agreement reached pursuant to the Collective Bargaining Agreement. *See Building Closure Updates*, GESTA IFPTE Local 29 (Dec. 27, 2025), https://www.gesta-goddard.org/blog/building-closure-updates (“in direct violation of a 2012 Negotiated Settlement Agreement between GESTA and NASA Goddard”); Local 29’s Mot. At 2 (“In 2012, GESTA resolved an unfair-labor-practice dispute with GSFC through a settlement agreement in which GSFC committed, among other things, to maintain a physical library at GSFC.”); *id.* at 8 (describing the settlement as a “specific labor instrument”).  Thus, Local 29’s attempt to enforce the Settlement Agreement pursuant to the collective bargaining agreement in this case is thus “of the type” that this Court has explained “is regularly adjudicated through the FSLMRS’s scheme: disputes over whether the Statute has been violated.” *Am. Fed. of Gov’t Emps.*, 929 F.3d at 760.

Moreover, the remedies that Local 29 ultimately seeks include, inter alia, an order prohibiting NASA from implementing Executive Order 14,343.  That is precisely the type of relief that this Court has previously explained a union could obtain through the statutory scheme.  *See Am. Fed. of Gov’t Emps.*, 929 F.3d at 760 (“[T]he unions ask the district court for the same relief that they could ultimately obtain through the statutory scheme, namely rulings on whether the executive orders are lawful and directives prohibiting agencies from following the executive orders during bargaining disputes.”).  Therefore, Local 29’s challenge is not wholly collateral to the statutory scheme.  *See Elgin v. Dep’t of the Treas.*, 567 U.S. 1, 22 (2012) (holding that a

- 27 -

constitutional claim was not wholly collateral to the CSRA scheme because the plaintiffs challenged "precisely the type of personnel action regularly adjudicated by the [Merit Systems Protection Board] and the Federal Circuit within the CSRA scheme" and "request[ed] relief that the CSRA routinely affords").

Third, Local 29's claims are within the expertise of the FLRA.  Local 29's challenges to the enforceability of the Settlement Agreement "lie at the core of the FLRA's 'specialized expertise in the field of federal labor relations.'" *Am. Fed. of Gov't Emps.*, 929 F.3d at 760.  Its claims about the effect of the Executive Order "require interpreting the FSLMRS—the very law that the FLRA is charged with administering and interpreting," *id.* at 760–61; *see* 5 U.S.C. § 7105(a), and Congress has directed the FLRA to adjudicate disputes over whether an agency has failed or refused to comply with the statute, *see* 5 U.S.C. § 7116(a).

In response, Local 29 relies exclusively on this Court's analysis in *National Treasury Employees Union v. Trump*, 780 F. Supp. 3d 237, 249–51 (D.D.C. 2025).  Defendants disagree with the conclusion reached in that case.  Just as "a federal court always has jurisdiction to determine its own jurisdiction," *United States v. Ruiz*, 536 U.S. 622, 628 (2002), including to consider the scope and validity of a jurisdiction-stripping provision, *see generally Boumediene v. Bush*, 553 U.S. 723 (2008), the FLRA also has authority to consider whether the executive order validly excluded NASA from coverage of the FSLMRS.  However, the FLRA disposes of that question, the losing party may then obtain judicial review of that question in the court of appeals.  Moreover, the fact that Local 29 seeks to relitigate *National Treasury Employees Union* while it is on appeal emphasizes that the Court should maintain the stay here.

In sum, since the CSRA and FSLMRS are "an integrated scheme, and since the settlement agreement arose from this integrated scheme, the settlement agreement must be enforced within

- 28 -

the procedures provided for in the [scheme] or not at all.  Therefore, the settlement agreement may not be enforced as a contract outside the [scheme] in any forum[.]"  *Bobula v. Dep't of Just.*, 970 F.2d 854, 858 (Fed. Cir. 1992).

### 2.    Executive Order 14,343 Was Not Ultra Vires As to NASA

Even if Local 29 could show that the Court has jurisdiction over this matter, it cannot show a likelihood of success on the merits of its ultra vires arguments (*see* Local 29's Mot. at 10) by a clear showing.  As an initial matter, a panel of the D.C. Circuit indicated that "courts generally lack authority to enjoin the President[.]"  *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025).

To prevail on its ultra vires claim, Local 29 must establish three things: (1) "he statutory preclusion of review is implied rather than express"; (2) "there is no alternative procedure for review of the statutory claim;" and (3) and action is "plainly . . . in excess of . . . delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory."  *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (internal quotation mark omitted).  Again, Local 29 relies entirely on *National Treasury Employees Union*.  *See* Local 29's Mot. at 10 (citing *Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 257-63 (D.D.C. 2025)).  But this case is unlike *National Treasury Employees Union* in two significant respects that favor Defendants here.

First, NASA's national security functions are crystal clear.  Local 29 claims that "NASA is a civilian space, aeronautics, science, and research agency.  Its statutory mission includes the expansion of human knowledge and dissemination of information concerning its activities and results."  Local 29's Mot. at 10 (citing 51 U.S.C. § 20102(d)(1), (3)).  While NASA's "statutory mission includes" a few factors that Local 29 highlights, statutory text makes plain that NASA's

organization and functions are steeped in national security concerns, which history and practice only confirm.

To start, Congress determined that NASA performs national security work under the very analysis that the Court applied in *National Treasury Employees Union.* In *National Treasury Employees Union*, 780 F. Supp. 3d at 261–62, this Court determined that it should look to the use of "national security" in *Cole v. Young*, 351 U.S. 536 (1956). The statute at issue in *Cole*, 351 U.S. at 541–42, which defined "national security," included the National Advisory Committee for Aeronautics, NASA's predecessor agency, as one of the agencies to which national security applies as default. NASA also remains in the statutory provision that succeeded the language addressed in *Cole*. Congress gave NASA alongside the military departments and a few other agencies, authority to suspend and remove employees "in the interests of national security." 5 U.S.C. §§ 7531–32.

History helps explain why Congress understood that NASA performs national security work. The Soviet Union's launch of *Sputnik I* created "fear that the free world had become vulnerable to a new form of attack and even destruction from outer space." H. Rep. 85-2710, at 8 (Jan. 3, 1959), *available at* https://www.govinfo.gov/content/pkg/SERIALSET-12077_00_00-099-2710-0000/pdf/SERIALSET-12077_00_00-099-2710-0000.pdf. Thus, in Congress's view, policies "encouraging the growth of science and technology must be viewed in terms of their effect both on direct military power and on the struggle for world leadership in political, psychological, and cultural terms." *Id.* at 10.

To address these concerns, in 1958, Congress created NASA out of the National Advisory Committee for Aeronautics, then a part of the Department of Defense. *See* National Aeronautics and Space Act of 1958 ("Space Act"), sec. 202, 301, Pub. L. 85-568, 72 Stat. 426, 429, 432. The

- 30 -

Space Act is chock full of security concerns. For instance, NASA was required to take part in a Civilian-Military Liaison Committee. *Id.* sec. 204. And the Act emphasized that NASA needed internal security to serve the needs of national security: *See id.* sec. 304(a) ("The Administrator shall establish such security requirements, restrictions, and safeguards as he deems necessary in the interest of the national security.").

Additional statutory text confirms that the purpose of NASA's work is to further the security of the United States. In one provision, "Congress declares that the general welfare and security of the United States require that adequate provision be made for aeronautical and space activities." 51 U.S.C. § 20102(b). Similarly, in another section, "Congress declare[d] that the general welfare and security of the United States require that the unique competence of the Administration be directed to detecting, tracking, cataloguing, and characterizing near-Earth asteroids and comets in order to provide warning and mitigation of the potential hazard of such near-Earth objects to the Earth." 51 U.S.C. § 20102(g). Further, Congress has made clear that the "uninterrupted capability for human space flight and operations"—surely a primary function of NASA—is "an essential instrument of national security." 51 U.S.C. § 70501.

Congress has also directed NASA to carry out specific national security related work. For instance, Congress has continued to direct NASA to engage in direct coordination with the Department of Defense. *See* 51 U.S.C. §§ 20114, 20304(b). NASA continues to have authorization to establish internal security requirements "in the interest of national security." 51 U.S.C. § 20132. In the National Aeronautics and Space Administration Authorization of 2010, Congress required the CIO of "NASA, in coordination with other national security agencies," to provide a biennial report about information security risks. Pub. L. 111-267, sec. 1207, 124 Stat.

- 31 -

2805, 2844, *codified at* 42 U.S.C. § 18445.  Thus, the text indicates that NASA itself is a "national security agenc[y]."  And national security undergirds many of NASA's other functions.

As Congress stated in 2009, NASA is a "multimission agency" and "NASA's activities can contribute to an improved quality of life, economic vitality, United States leadership in peaceful cooperation with other nations on challenging undertakings in science and technology, national security, and the advancement of knowledge."  National Aeronautics and Space Administration Authorization Act of 2008, Pub. L. 110-422, sec. 204, 122 Stat. 4779, 4781 (Oct. 15, 2008).  *See also* 51 U.S.C. § 40102 (NASA is "the lead agency for civil aeronautics research" and "shall promote aeronautics research and development that will expand the capacity, ensure the safety, and increase the efficiency of the Nation's air transportation system," and "promote the security of the Nation"); 51 U.S.C. § 50116(a) (NASA's commercial technology transfer program "shall be maintained in a manner that provides clear benefits for the Administration, the domestic economy, and the research community, while protecting national security").  Congress recognized NASA's national security work—and granted NASA extra authority related to the agency's national security role—in diverse contexts.  For example, 41 U.S.C. § 4713(k)(7) authorizes "the Department of Defense, the Coast Guard, and [NASA]" to make use of certain procurement procedures when required to address "an urgent national security interest."  Given all of this, Local 29 has not made a clear showing that it was an ultra vires action for the President to determine that NASA has "as a primary function . . . national security work[.]"  5 U.S.C. § 7103(b)(1)(A).

Second, in *National Treasury Employees Union* and subsequent cases, this court emphasized that Executive Order 14,251 was ultra vires because of that Order's "unprecedented scope."  *Am. Foreign Serv. Ass'n*, 783 F. Supp. 3d at 264; *Nat'l Treasury Emps. Union*, 780 F. Supp. 3d at 258 ("The scope of the Executive Order when compared with the intent of Congress

in passing the FSLMRS, coupled with the surrounding statements in the Fact Sheet and OPM Guidance—which strongly suggest that President Trump's invocation of Section 7103(b)(1) was mere pretext for retaliation and for accomplishing unrelated policy objectives—are persuasive reasons to believe NTEU likely will be successful on the merits of its claim."); *Fed. Educ. Ass'n*, 795 F. Supp. 3d at 93 (explaining that if the Court evaluated Executive Order 14,251 in its entirety, "the Union Plaintiffs are likely to succeed on their *ultra vires* claim for the same reasons as explained in *NTEU*").

The scope of Executive Order 14,343 is significantly more modest than the scope of Executive Order 14,251.  Executive Order 14,251 "include[d] approximately two-thirds of the federal workforce."  *Nat'l Treasury Emps. Union*, 780 F. Supp. 3d at 258.  Here, Executive Order 14,343 addresses a few "[a]gencies or subdivisions of the Department of Commerce," NASA, and the United States Agency for Global Media.  Exec. Order 14,343 § 2, 90 Fed. Reg. 42,683, 42,683.  This limited scope provides no similar reason to doubt the presumption of regularity.

Local 29 does not address this key and obvious difference from *National Treasury Employees Union* and has therefore forfeited a response.  *See* Local Mot. at 10; *Harrison v. Off. of Architect of Capitol*, 68 F. Supp. 3d 174, 183 (D.D.C. 2014) ("The arguments Plaintiff raises for the first time in her reply are forfeited because it leaves Defendant with no opportunity to respond."), *aff'd*, 793 F.3d 119 (D.C. Cir. 2015).

        3.       NASA's Decision to Repudiate the Settlement Agreement Pursuant to Executive Order 14,343 Was Proper

For similar reasons, Local 29 is not likely to show that NASA unlawfully implemented Executive Order 14,343 in deciding to close the Goddard Library.  The Settlement Agreement arose from a dispute about rights under FLSMRS, in a case that was filed under the procedures of

the FLSMRS, and incorporated bargaining and consultation provisions of a collective bargaining agreement entered under the FSLMRS. *See generally* Settlement Agreement, ECF No. 13-4.

The President invoked clear statutory language and exercised the national security judgment to determine that FLSMRS "cannot be applied to [NASA] in a manner consistent with national security requirements and considerations." Exec. Order 14,343 § 1, 90 Fed. Reg. 42,683, 42,683. So NASA was "duty-bound to give effect to" the Executive Order. *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002). And applying the FSLMRS to NASA by giving effect to the Settlement Agreement would have been itself illegal under 5 U.S.C. § 7103(b)(1) and contrary to the national security judgment of the President.

Without citing caselaw, Local 29 argues that NASA improperly decided to implement Executive Order 14,343 "before the lawfulness of" decisions to do so "is determined." Local 29's Mot. at 11. This argument flips the preliminary injunction standard and the Administrative Procedure Act on their heads. There is no requirement for agencies to wait for the resolution of potential lawsuits before deciding to act. Thus, Plaintiffs have not shown a "specific prohibition the defendants have violated to an extreme and nearly jurisdictional degree." *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025).

Finally, to the extent that Local 29 wants to file suit to enforce the Settlement Agreement, it must do so before the FLRA—not this Court. *See* Settlement Agreement ¶ 5, *Williams*, *supra*, ECF No. 8-3 at 13 ("[T]he parties will address the alleged Agreement violation, problem(s), or dispute(s)[] in accordance with the provisions set forth in the CBA and/or applicable law.").]; 5 U.S.C. § 7105(a)(1)(G) (FLRA "conduct[s] hearings and resolve[s] complaints of unfair labor practices under section 7118 of this title"); *Am. Fed'n of Gov't Emps. Loc. 2305 v. United States Dep't of Veterans Affs.*, --- F.4th ---, No. 26-1321, 2026 WL 1379424, at *9 n.4 (1st Cir. May 16,

2026) ("The FSLMRS provides that CBAs 'shall provide procedures for the settlement of grievances,' which include 'claim[s] of breach' of a CBA. And subject to a few exceptions, those procedures 'shall be the exclusive administrative procedures for resolving grievances which fall within its coverage.'" (quotation omitted)).

### 4.    Local 29's Claims Here Are Claim Splitting

Finally, Local 29 cannot show that it has a likelihood of success on the merits because this Court would be within its discretion to dismiss Local 29's claim under the doctrine of claim splitting. *See also EEOC v. Fresh Venture Foods, LLC*, Civ. A. No. 21-7679, 2022 WL 3137722, at *4 (C.D. Cal. May 24, 2022) (denying intervention because it would violate the doctrine against claim-splitting).

"[T]he claim-splitting rule provides a valid, independent basis for dismissal, even absent a final judgment." *Steele v. United States*, 144 F.4th 316, 324 (D.C. Cir. 2025). Whether there has been claim-splitting depends on whether "claims arise from the same transaction or share a common nucleus of operative facts"—not whether the legal theory is different. *Jolley v. United States*, Civ. A. No. 21-2709 (TSC), 2023 WL 3619415, at *5 (D.D.C. May 24, 2023); *see also Scholz v. United States*, 18 F.4th 941, 952 (7th Cir. 2021) ("[F]or claim splitting to apply, the legal theories for the claims in each case need not be the same provided 'they are based on the same, or nearly the same, factual allegations.'" (quoting *Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chi.*, 649 F.3d 539, 547 (7th Cir. 2011))).

Both this case and *Williams* rely on the same transaction and the same common nucleus of facts: NASA's decision to consolidate the library after Executive Order 14,343. The only differences between this case and that case are the legal theory and that Judge Cooper has already denied emergency relief. Accordingly, Local 29's claim would fail on the merits here and intervention is unwarranted.

### B.    Local 29 Faces No Irreparable Injury

Not every change is an "irreparable injury" warranting injunctive relief.  Under governing law, an irreparable injury must "must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Moreover, the injury "must be beyond remediation"—that is even a "substantial" harm to "money, time, and energy necessarily expended in the absence of a stay or not enough."  *Id.* at 297–98 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Local 29 neither shows a "certain and great" injury" or an "actual and not theoretical injury" that is "beyond remediation."  Throughout its motion, citing no authority, Local 29 repeatedly asserts that it will suffer an irreparable injury if NASA is allowed to further alter the status quo.  *See* Local 29's Mot. at 2 (arguing that a change in the library policy is "exactly the type of irreparable EO-implementation harm that warrants . . . emergency preservation relief here").  But Local 29 does not show that the injury is "great."  NASA seeks to remove excess materials and consolidate its library collection.  This change does not rise to the level warranting emergency relief.  Moreover, in so doing, it appears that Local 29 seeks to flip the burden and insist that NASA cannot alter the status quo, even though the issuance of an injunction is the extraordinary result.

More importantly, Local 29 fails to show the "certain[ty]" of an injury that is "beyond remediation."  Throughout, Local 29 speculates that NASA's continued consolidation "may" create an irreparable injury.  *See* Local 29's Mot. at 2–3 ("the eventual resolution of this case and related D.C. Circuit proceedings may come too late to restore meaningful relief"); *see also id.* at 7, 11, 12.  Local 29's speculation is insufficient to carry its burden that irredeemable injury is certain.  After all, it appears likely that NASA could reverse the consolidation as to non-excess

material—albeit at "substantial" cost to "money, time, and energy" *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 (quoting *Wisc. Gas Co.*, 758 F.2d at 674).

For instance, Local 29 fails to show how the harm would not be "be mitigated to a fair extent by reinstating the terminated agreements if [it] were to prevail." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 167 F.4th 1247, 1259 (9th Cir. 2026) (citing *Am Fed'n of Gov't Emps v. Trump*, 148 F.4th 648, 656 (9th Cir. 2025)).

In *Williams*, the court determined that "the potential loss of records from the Goddard library" is not an irreparable injury. *Williams*, 2026 WL 1162715, at *7. Local 29 contends that the harm that it describes here "is not the same irreparable-harm theory rejected in *Williams*." *Id.* at 11–12. But Local 29 is seeking to re-litigate this issue on a different legal theory—not different facts. As the *Williams* court determined, the purportedly irreversible harm in dispersing or reducing the collection is not irreversible. They could still "access the materials that were once housed there," *Williams*, 2026 WL 1162715, at *7, and were not in excess.

Finally, to the extent that Local 29 claims there is an irreparable injury here separate from the injury in *Williams*, it is worth emphasizing that Local 29 "ha[s] been slow to seek a preliminary injunction" based on that theory, "which belies their current claim to need emergency relief." *Cayuga Nation v. Zinke*, 302 F. Supp. 3d 362, 373 (D.D.C. 2018). Local 29 has known about Executive Order 14,343 for months, has asserted a breach of the settlement agreement for months and has known about NASA's attempts to consolidate the collection for months. Yet Local 29 waited for months to claim an irreparable injury. *See also id.* ("[A]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005))).

- 37 -

###### C.    Balance of Harms and Public Interest

The balance of harms and public interest strongly tilt toward Defendants.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party.").  Local 29's argument consists of little more than its parochial interest in a labor settlement agreement that it has deliberately chosen not to seek to enforce.  *See* Local 29's Mot. at 12–13; Compl. ¶ 112, *Williams*, *supra* ("Plaintiffs do not seek enforcement of the 2012 Settlement Agreement as a labor contract[.]").

By contrast, a panel of the D.C. Circuit concluded that "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest. To hold otherwise would give to the courts what the Constitution gave to Congress and the President." *Nat'l Treasury Emps. Union*, 2025 WL 1441563, at *3.  A subsequent panel echoed that conclusion.  *Am. Foreign Serv. Ass'n*, 2025 WL 1742853, at *3 (quoting *Nat'l Treasury Emps. Union*, 2025 WL 1441563, at *3).  Similarly, when the Ninth Circuit stayed an injunction related to Executive Order 14,251, it held that "the government's asserted interest in national security outweighs the interests of the plaintiff unions, considering the balance Congress struck in § 7103(b)(1)." *Am. Fed. of Gov't Emps. v. Trump*, 167 F.4th 1247, 1259 (9th Cir. 2026).

Here, too, the national security interests and the importance of validating Congress's express delegation to the President are of significance.  Local 29 argues that the burden to Defendants is not significant because it purportedly seeks to "impose[] modest burdens."  Local 29's Mot. at 13.  But that relief comes with modest benefits to the public and to Local 29 as well. National security determinations should outweigh the possibility that some redundant library material may be destroyed.

Additionally, the taxpayer—through NASA —is bearing the burden of storing the excess material that should be sent to GSA and the costs of trying to work around the use of storage space.

NASA has undertaken costs with respect to the expected transfer to library consolidation at the Glenn Research Center by shipping supplemental shelving units, reinforcing the floor, and hiring staff. Willis Decl. ¶ 10. If the Court were to further extend the voluntary standstill as Local 29 demands, American taxpayers would bear the costs. "NASA is carrying out a long-planned consolidation of its buildings and facilities at Greenbelt to serve the agency's needs and efficiently use taxpayer dollars." Rubilotta Decl. ¶ 5. The accommodations made to Local 29 "has impeded NASA's ongoing reorganization efforts." *Id.* ¶ 8. NASA is using finite warehouse space to store the excess materials that it wishes to dispose of. *Id.* While NASA has been able to work around this problem so far, "these solutions have added time and complexity to an already time-intensive and complicated process." *Id.*

### D.  Significant Security Should Be Imposed

Defendants also respectfully request that any injunctive relief be accompanied by a bond. "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The D.C. Circuit recently clarified that "injunction bonds are generally required." *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025); *cf. Widakuswara v. Lake*, No. 25-5145, 2025 WL 1288817 (D.C. Cir. May 3, 2025) (stay of injunction warranted because, among other things, "the district court did not require plaintiffs to post any injunction bond"). A bond is appropriate here given that delaying the consolidation costs has created costs for storage and for working around the use of the storage space. *See* Rubilotta Decl. ¶¶ 7–8.

\*    \*    \*

- 39 -

## CONCLUSION

For these reasons, Local 29's second attempt at an "emergency motion" should be denied.

Dated: June 1, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: _____ */s/ Brian J. Levy* _____
BRIAN J. LEVY
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-6734

*Attorneys for the United States of America*

- 40 -