UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| INTERNATIONAL FEDERATION OF PROFESSIONAL AND TECHNICAL ENGINEERS, AFL-CIO, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 25-3615 (PLF) |
| DONALD TRUMP, et al. | ) ) | |
| Defendants. | ) ) ) | |

OPINION

This matter is before the Court on proposed plaintiff-intervenor Goddard

Engineers, Scientists and Technicians Association's ("GESTA") Emergency Motion to

Intervene, to Modify the Stay, and for Temporary Restraining Order and Preliminary Injunction

("Mot.") [Dkt. No. 13]. Defendants opposed the motion. See Defendants' Memorandum in

Opposition ("Opp.") [Dkt. No. 22]. The Court held oral argument on June 10, 2026, and on June

30, 2026, entered a Memorandum Opinion and Order denying plaintiff-intervenor's motion. See

Memorandum Opinion and Order of June 30, 2026 [Dkt. No. 25]. This Opinion explains the

reasoning underlying that Memorandum Opinion and Order.[1]

---

[1]    The papers reviewed by the Court in connection with this matter include: Complaint ("IFPTE's Compl.") [Dkt. No. 1]; Notice of Related Cases ("Notice") [Dkt. No. 6]; Reassignment of Civil Case [Dkt. No. 11]; December 22, 2025 Minute Order; Plaintiff-Intervenor's Emergency Motion to Intervene, to Modify the Stay, and for Temporary Restraining Order and Preliminary Injunction ("Mot.") [Dkt. No 13]; Proposed Complaint ("GESTA's Compl.") [Dkt. No. 13-1]; Declaration of Tryshanda Moton ("Moton Decl.") [Dkt. No. 13-2]; Defendants' Memorandum in Opposition ("Opp.") [Dkt. No. 22]; Declaration of Gary Willis ("Willis Decl.") [Dkt. No. 22-2]; and Plaintiff-Intervenor's Reply in Support ("Reply") [Dkt. No. 23].

I.  BACKGROUND

*A.  Statutory Background*

The Federal Service Labor-Management Relations Statute, set forth in Title VII of the Civil Service Reform Act, Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (1978) (codified at 5 U.S.C. §§ 7101-35) ("FSLMRS"), provides certain protections of the "right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . ."  5 U.S.C. § 7101(a)(1).  In passing the statute, Congress found, based on "experience in both private and public employment," that the protections were necessary to "safeguard[] the public interest," "contribute[] to the effective conduct of public business," and "facilitate[] and encourage[] the amicable settlements of disputes between employees and their employers involving conditions of employment."  Id.  In sum, Congress found that "labor organizations and collective bargaining in the civil service are in the public interest."  Id.

Among other things, the FSLMRS requires federal agencies to collectively bargain "with respect to the conditions of employment affecting such employees."  5 U.S.C. § 7103(a)(12).  The statute provides a role for "labor organizations" in this collective bargaining process, stating:

> A labor organization which has been accorded exclusive recognition is the exclusive representative of the employees in the unit it represents and is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit.  An exclusive representative is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership.

5 U.S.C. § 7114(a)(1).

2

While Congress extended these protections to "many" federal employees, it did not "include the entire federal workforce within this regime." See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d 723, 724 (D.C. Cir. 1989). "The Act itself exempted several federal agencies from coverage," including the Federal Bureau of Investigation, the Central Intelligence Agency, and the National Security Agency. See id.; 5 U.S.C. § 7103(a)(3). In addition to these explicit exclusions, "Congress also addressed the matter of national security" in Section 7103(b). See Soc. Sec. Admin. Baltimore, Maryland (Agency) & Am. Fed'n of Gov't Emps. (Petitioner/Labor Org.), 59 F.L.R.A. 137, 143 (Sep. 12, 2003). Specifically, Congress granted the President the authority to either exclude or suspend certain "agenc[ies] or subdivision[s] thereof" from the statute's coverage. See 5 U.S.C. § 7103(b). Section 7103(b) provides:

> (1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that –
>
> > (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
> >
> > (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.
>
> (2) The President may issue an order suspending any provision of this chapter with respect to any agency, installation, or activity located outside the 50 States and the District of Columbia, if the President determines that the suspension is necessary in the interest of national security.

5 U.S.C. § 7103(b).

*B. Factual Background*

1.  Executive Orders

On March 27, 2025, the President issued an executive order titled "Exclusions from Federal Labor-Management Relations Programs" that excluded numerous agencies and subdivisions from the collective bargaining protections of the Federal Service Labor-Management Relations Statute under 5 U.S.C § 7103(b)(1).  Exec. Order No. 14251, 90 Fed. Reg. 14553 (Mar. 27, 2025) ("EO 14251").  In support of this unprecedented action, President Trump invoked a narrow exception in the FSLMRS – the statute that codified the rights of federal employees to collectively bargain and "participate through labor organizations of their own choosing in decisions which affect them," 5 U.S.C. § 7101(a)(1).  The statute permits the President to exclude specific agencies or subdivisions from coverage of the statute if he determines that "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and that the statute's provisions "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."  Id. § 7103(b)(1).

A "Fact Sheet" issued by the White House the same day proclaimed that "[c]ertain Federal unions have declared war on President Trump's agenda," and explained that the Civil Service Reform Act "enables hostile Federal unions to obstruct agency management," and that this "is dangerous in agencies with national security responsibilities."  See Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements, WHITE HOUSE (Mar. 27, 2025), [https://perma.cc/Y7HR-4W3H] ("EO 14251 Fact Sheet").  On August 28, 2025, the President issued Executive Order No. 14343, titled "Further Exclusions from Federal Labor-Management Programs," Exec. Order

No. 14343, 90 Fed. Reg. 42,683 (Aug. 28, 2025) ("EO 14343"). EO 14343 is a supplemental continuation of EO 14251, titled "Exclusions from the Federal Labor-Management Relations Program," which similarly excluded numerous agencies and subdivisions from the collective bargaining protections of the FSLMRS under 5 U.S.C § 7103(b)(1). See Nat'l Weather Serv. Emps. Ass'n v. Trump, Civil Action No. 25-2947 (PLF), 2025 WL 4083333, at *1 (D.D.C. Oct. 7, 2025).

EO 14343 excludes six additional agencies from coverage under the FSLMRS, including NASA, stating that the agencies "are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work. It is also hereby determined that Chapter 71 of title 5, United States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." EO 14343; See IFTPE Compl. ¶¶ 3, 38. An accompanying Fact Sheet issued by the White House the same day claims that NASA has a "national security mission" because "NASA develops and operates advanced air and space technologies, like satellite, communications, and propulsions systems, that are critical for U.S. national security." See IFTPE Compl. ¶ 39; Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements, WHITE HOUSE (Aug. 28, 2025), [https://perma.cc/6EC8-9KWG] ("EO 14343 Fact Sheet").

2. The Goddard Library and 2012 Settlement Agreement

GESTA is a local affiliate of the International Federation of Professional and Technical Engineers ("IFPTE") and represents bargaining-unit employees at NASA's Goddard Space Flight Center ("GSFC") in Greenbelt, Maryland. See Mot. at 2; Declaration of Tryshanda Moton ("Moton Decl.") [Dkt. No. 13-2] ¶ 1. IFPTE is a labor organization whose members

5

include thousands of workers employed by NASA.  Complaint ("IFPTE Compl.") [Dkt. No. 1] ¶ 2.

GSFC's Goddard Library has historically functioned as NASA's largest research library, housing "approximately 127,000 items, including books, journals, reference materials, technical reports, oversize documents, atlases, and other media."  See GESTA Proposed Complaint ("GESTA Compl.") ¶¶ 12-13.  In 2012, GESTA and GSFC entered into a settlement agreement resolving a labor dispute concerning the Goddard Library.  GESTA Compl. ¶ 13. Among other things, GSFC agreed to "maintain a centralized collection of GSFC physical library resources at the Greenbelt campus, Building 21; support the reopening and operation of the physical library; provide GESTA notice regarding proposed changes to the library; and recognize bargaining obligations concerning such changes."  Moton Decl. ¶ 4; see id. Ex. A ("Settlement Agreement"), at 1.

Specifically, the Settlement Agreement provides that GSFC will "provide GESTA Bargaining Unit Employees (BUE's) with access to the physical library for five hours per workday;" "ensure GESTA receives advance notice of any scheduled major facility construction/renovation library project(s);" and "notify GESTA when decisions would have an impact on working conditions," and to give GESTA "reasonable time… after receipt of… notice to consider [the] proposed change and make an election to consult, to bargain on the impact/implementation, or to bargain on the substance of the proposal as appropriate." Settlement Agreement ¶ 1(a)-(d).  GESTA has understood and relied on the 2012 Settlement Agreement as "protecting the continued operation and availability of the Goddard Library as a physical workplace resource for bargaining-unit employees."  See Moton Decl. ¶ 5.

Consistent with government-wide initiatives to reduce excess real property, NASA recently announced that it is carrying out a "long-planned consolidation of its buildings and facilities at Greenbelt to serve the agency's needs and efficiently use taxpayer dollars." Second Rubilotta Decl. ¶ 5; see Opp. at 6.  Before 2025, NASA's plans for the facility "did not include closure or consolidation of the Goddard Library because of" the 2012 Settlement Agreement between GESTA and GSFC.  See Opp. at 6.  "Under that agreement, NASA agreed to maintain a collection of "physical library resources" at the Goddard Library and to ensure the continued availability of multifunction space."  Id. (citing Settlement Agreement ¶ 1(a)). Following the issuance of EO 14343 in August 2025, however, "NASA determined that facilities planning decisions—including those affecting the Goddard Library—could proceed without the constraints imposed by the 2012 Settlement Agreement."  Id. at 6-7; GESTA Compl. ¶ 16. NASA intended to "reallocate the library space for other agency purposes as part of a revised Goddard Master Plan."  See Opp. at 8 (quoting Eric Niiler, NASA's Largest Library Is Closing Amid Staff and Lab Cuts, N.Y. Times (Dec. 31, 2025), https://www.nytimes.com/2025/12/31/climate/nasa-goddard-library-closing.html).

In September 2025, GESTA released a statement about the GSFC closures, noting that "[d]ue to Executive Order 14343, management is no longer recognizing [GESTA's] Collective Bargaining Agreement" and that negotiations with management regarding building moves have "been halted."  See Opp. at 7 (quoting Building Closures Guidance, GESTA IFPTE LOCAL 29 (Sep. 29, 2025), https://perma.cc/4ZD9-YT7E).  GESTA continued to release statements opposing the building closures and relocations in November 2025.  See id.

In early December 2025, NASA "suspended operations at the Goddard Library and initiated a sixty-day assessment of the collection to determine what materials should be

retained, archived, digitized, or otherwise dispositioned." See Opp. at 7.  On

December 27, 2025, GESTA released another statement, stating that "[t]he closure of the GSFC

library is in direct violation of a 2012 Negotiated Settlement Agreement between GESTA and

NASA Goddard."  See Opp. at 8 (quoting Building Closure Updates, GESTA IFPTE LOCAL 29

(Dec. 27, 2025), https://perma.cc/29VL-AGY2).  On January 7, 2026, IFPTE released its own

statement condemning the "rapid and haphazard shutdown of the [Goddard] library."  Id.

(quoting IFPTE Responds to NASA Administrator Isaacman's Misleading and Misguided

Explanation for Closing NASA's Largest Research Library, IFPTE (Jan. 7, 2026),

https://perma.cc/NN86-CT2F).

NASA has since "closed the Goddard Library, completed a rapid assessment of

the collection, and prepared thousands of boxes of materials for shipment, transfer, or

disposition."  Moton Decl. ¶ 7.  As of approximately March 27, 2026, NASA "finished boxing

up the materials held in the Goddard Library collection and emptied out the space."  Declaration

of Gary Willis ("Willis Decl.") [Dkt. No. 22-2] ¶ 6.  NASA "has transferred or plans to transfer

materials from the Goddard Library collection to four offices:"  (1) NASA's Chief Archivist,

(2) the NASA STI Repository, (3) the Glenn Research Center in Cleavland, Ohio "for

consolidation with a central, agency wide library," and (4) the General Services Administration

("GSA"), which will receive shipments of the remaining material, or "excess"  for disposition.

Willis Decl. ¶¶ 5, 7-11.

### C.  Procedural Background

On October 8, 2025, IFPTE filed suit in this Court seeking to invalidate EO 14343

and enjoin defendants from implementing it.  See IFPTE Compl. ¶ 4.  IFTPE is a national labor

organization whose local unions serve as the bargaining representatives for federal employees at

multiple agencies, including NASA.  Id. ¶ 8.  IFTPE represents approximately 6,000 bargaining unit employees at NASA, specifically "IFTPE Local 9 (NASA Headquarters Professional Association);" "IFPTE Local 27 (Marshall Engineers and Scientists Association);" "IFTPE Local 28 (Lewis Engineers and Scientists Association);" "ITPTE Local 30 (Ames Federal Employees Union);" and, relevant here, "IFTPE Local 29 (Goodard Engineers, Scientists and Technicians Association)."  Id. ¶ 10.  IFPTE brought this action "on its own behalf, on behalf of its local unions, and on behalf of its members."  Id. ¶ 8.

In its complaint, IFTPE brings six claims:  (1) EO 14343 is ultra vires because it exceeds the President's authority under 5 U.S.C. § 7103(b)(1); (2) EO 14343 was issued in retaliation for IFPTE's protected activity and violates the First Amendment; (3) EO 14343 violates the Fifth Amendment's Takings Clause and prohibition against "the government's retroactive abrogation of its contracts;" (4) EO 14343 violates the Fifth Amendment's guarantee of equal protection; (5) EO 14343 and NASA's retroactive nullification of collective bargaining agreements violates the Fifth Amendment's guarantee of  procedural due process; and (6) actions taken by the Acting Administrator of NASA related to EO 14343 are unlawful and arbitrary and capricious in violation of the Administrative Procedure Act ("APA").  See IFTPE Compl. ¶¶ 58-91.

Prior to the filing of IFPTE's complaint, this Court was assigned and has been overseeing several cases involving various labor organizations and their claims related to EO 14251 and EO 14343, both of which exclude numerous agencies and subdivisions from collective bargaining protections.  The first case, National Treasury Employees Union v. Trump ("NTEU"), was filed on March 31, 2025, and randomly assigned to the undersigned.  See Nat'l Treasury Emps. Union v. Trump, Civil Action No. 25-0935 (PLF), Complaint [Dkt. No. 1]

9

(D.D.C March 31, 2025).  The plaintiff in NTEU, a federal labor organization, challenged Section 2 of EO 14251 and brought three counts:  (1) an ultra vires claim alleging that EO 14251 misapplied the exclusionary provision in 5 U.S.C. § 7103(b)(1); (2) an ultra vires claim alleging that EO 14251 was inconsistent with the FSLMRS; and (3) a First Amendment retaliation claim. See id. ¶¶ 78-95.

The Court preliminarily enjoined the implementation of EO 14251 on April 25, 2025.  Nat'l Treasury Emps. Union v. Trump, Civil Action No. 25-0935 (PLF), 2025 WL 1201696, at *1 (D.D.C. Apr. 25, 2025) (Order); Nat'l Treasury Emps. Union v. Trump, 780 F. Supp. 3d 237 (D.D.C. 2025) (Opinion).  The Court concluded that it had jurisdiction over the case, and that the union plaintiff had shown a likelihood of success in demonstrating that the Executive Order was ultra vires.  See NTEU, 780 F. Supp. 3d at 248-53.  The Court subsequently issued two more preliminary injunctions in related cases challenging EO 14251.  See Am. Foreign Serv. Ass'n v. Trump, 783 F. Supp. 3d 248 (D.D.C. 2025); Fed. Educ. Ass'n v. Trump, 795 F. Supp. 3d 74 (D.D.C. 2025).  In each of the three cases, the defendants appealed the Court's Order.  The D.C. Circuit held argument on all three cases on December 15, 2025, but has not yet issued its opinions.  See Nat'l Treasury Emps. Union v. Trump, No. 25-5184 (D.C. Cir.); Am. Foreign Serv. Ass'n v. Trump, No. 25-5184 (D.C. Cir.), and Fed. Educ. Ass'n v. Trump, No. 25-5303 (D.C. Cir.).]

Pursuant to this Court's Local Civil Rules, IFPTE filed a notice of relatedness on October 10, 2025.  See LCvR 40.5; Notice of Related Cases ("Notice") [Dkt. No. 6].  The Notice identified eight related cases filed in this district that are before the undersigned. See Notice at 2. The Court has previously held that it considers all the cases before it challenging either EO 14251 or EO 14343 to be related because the cases (1) "involve common issues of fact" and

10

(2) "grow out of the same event or transaction." See Am. Fed'n of Labor and Cong. of Indus. Orgs. v. Trump, Civil Action No. 25-2445 (PLF), 2025 WL 2301989, at *1 (D.D.C. Aug. 11, 2025; Nat'l Weather Serv. Emps. Ass'n v. Trump, Civil Action No. 25-2947 (PLF), 2025 WL 4083333 (D.D.C. Oct. 7, 2025) (slip copy). The government did not object to IFPTE's Notice and the case was reassigned to the undersigned on December 11, 2025. See Reassignment of Civil Case [Dkt. No. 11].

In light of the D.C. Circuit's still pending decisions in National Treasury Employees Union v. Trump, No. 25-5157 (D.C. Cir.), American Foreign Service Ass'n v. Trump, No. 25-5184 (D.C. Cir.), and Federal Education Ass'n v. Trump, No. 25-5303 (D.C. Cir.), the Court ordered that all proceedings in each related case be stayed, and all pending motions be held in abeyance. See Int'l Fed. of Pro. and Tech. Eng'rs v. Trump, Civil Action No. 25-3615 (PLF), Minute Order (D.D.C Dec. 22, 2025).

On February 19, 2026, in a separate action, GESTA filed suit against NASA, the NASA Administrator, and the Acting Archivist seeking declaratory and injunctive relief to prevent NASA from "the unlawful disposition, destruction and dispersal of federal records and materials housed at" GSFC and to "vacate and rescind the decision to permanently close the Goddard Library." See Williams v. NASA, Civil Action No. 26-0564 (CRC), Complaint (D.D.C. Feb. 19, 2026) [Dkt. No. 1] ("Williams Compl.") ¶¶ 1, 10. GESTA and the other plaintiffs in Williams v. NASA brought claims and sought emergency relief under the Federal Records Act ("FRA") and the Administrative Procedure Act ("APA"). See Mot. at 11; see also Williams Compl. at 16-26. In Williams v. NASA, the plaintiffs emphasized in their preliminary

11

injunction motion that they "do not ask the Court to enforce the 2012 Settlement Agreement as a labor contract," but instead assert that the Agreement "demonstrates NASA's promise to (1) make a good faith effort to keep a physical library open at GSFC indefinitely and (2) provide GSFC employees advanced notice of any major disruption to library functions." Williams v. NASA, Civil Action No. 26-0564 (CRC), Emergency Motion for Temporary Restraining Order, Motion for Preliminary Injunction (D.D.C. Feb. 26, 2026) [Dkt. No. 3] at 11. The plaintiffs in Williams v. NASA argue that the closure of the Goddard Library impermissibly "disregards concrete reliance interests created by NASA's previously negotiated commitment," and that NASA cannot reverse course "without acknowledging the change and providing a reasoned explanation for disregarding those reliance interests." Id. at 10-11.

Judge Cooper denied GESTA's preliminary injunction motion on April 29, 2026. See Williams v. NASA, 2026 WL 1295719, at *1 (D.D.C. May 11, 2026) (reissued with redactions). Judge Cooper held that plaintiffs had "not established irreparable harm arising from the Goddard Library's closure" because they "ha[d] not explained how NASA's plans to repurpose the Goddard Library space would cause irreparable harm if they could still access the materials that were once housed there." Id. at *7; see also id. at *14 ("Plaintiffs are not entitled to preliminary relief on this claim because they have not established irreparable harm arising from the Goddard Library's closure."). Because the plaintiffs did not bring any claims related to the executive order or the settlement agreement, the court "did not decide the validity of EO 14343 as applied to NASA, did not decide whether the 2012 Settlement Agreement remains enforceable, and did not decide whether NASA lawfully relied on EO 14343 to repudiate GESTA's settlement rights." See Mot. at 4-5 (citing Williams v. NASA, 2026 WL 1295719, at *16 n.8 ("By concluding that Plaintiffs have not established irreparable harm, the Court does

not opine on whether Plaintiffs' challenge to the library closure is channeled to an administrative review scheme by the Civil Service Reform Act or the Federal Service Labor-Management Relations Statute.")).

On May 1, 2026, two days after Judge Cooper denied preliminary injunctive relief, GESTA filed the instant emergency motion, seeking to intervene in IFTPE's action, to modify the Court's stay, and to request a temporary restraining order and preliminary injunction "preserving the status quo" of the Goddard Library pending resolution of whether EO14343 "lawfully applies to NASA and lawfully permits NASA to repudiate or disregard GESTA's 2012 Settlement Agreement" with GSFC.  See Mot. at 1.  GESTA's proposed complaint brings two counts:  (1) as applied to NASA, EO 14343 exceeds the President's authority under Section 7103(b)(1) and "NASA's implementation of EO 14343 by treating the 2012 Settlement Agreement as unenforceable, inapplicable, legally irrelevant, or nullified without lawful authority" is ultra vires, contrary to law, and in excess of statutory authority; and (2) NASA's actions "treating the 2012 Settlement Agreement as no longer restraining management choices without adequately explaining how EO 14343 lawfully nullified, terminated, or rendered irrelevant a preexisting settlement agreement resolving a prior labor dispute" are arbitrary and capricious.  See GESTA Compl. ¶¶ 21-29.

IFPTE informed GESTA, the defendants, and this Court that it is "taking no position on [GESTA's] motion."  Joint Status Report [Dkt. No. 19] at 2.  Defendants filed their opposition to the motion on June 1, 2026, arguing that GESTA's interests are adequately represented by IFPTE, that GESTA's motion is untimely, that GESTA fails to show a change in circumstances warranting a modification of the stay, and that GESTA fails to show irreparable injury, likelihood of success on the merits, or that the balance of the equities and public interest

weighs in its favor.  See Opp. at 1.  GESTA filed their reply in support of their motion on June 8, 2026.  See Reply.  The Court held oral argument on June 10, 2026.  See Minute Entry, June 11, 2026.  The Court denied GESTA's motion to modify on June 30, 2026.  See Memorandum Opinion and Order of June 30, 2026 [Dkt. No. 25].  This Opinion explains the reasoning underlying that Order.

## II.  LEGAL STANDARD

If a stay is imposed, the court may lift the stay "[w]hen circumstances have changed such that the court's reasons for imposing the stay no longer exist or are inappropriate." Marsh v. Johnson, 263 F. Supp. 2d 49, 52 (D.D.C. 2003).  In determining whether to do so, the Court retains the same "inherent power and discretion" it exercised to impose the stay.  Id.

A federal district court's power to stay proceedings is incidental to its inherent power to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  Bledsoe v. Crowley, 849 F.2d 639, 645 (D.C. Cir. 1988) (quoting Landis v. N. Am. Co., 299 U.S. 248, 254 (1936)).  Parties "may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted."  See Landis v. N. Am. Co., 299 U.S. at 256.  In "the exercise of [its] judgment," the Court must "'weigh competing interests and maintain an even balance' between the court's interests in judicial economy and any possible hardship to the parties."  Belize Soc. Dev. Ltd. v. Gov't of Belize, 668 F.3d 724, 732-33 (D.C. Cir. 2012) (quoting Landis v. N. Am. Co., 299 U.S. at 254-55, 259).  The court's determination of whether a stay is warranted "is inextricably intertwined with the nature of the specific case."  Wrenn v. District of Columbia, 179 F. Supp. 3d 135, 137 (D.D.C. 2016).

A court may appropriately stay an action pending resolution of separate and independent proceedings bearing upon the case.  Hulley Enter. Ltd. v. Russian Fed'n, 211 F. Supp. 3d 269, 276 (D.D.C. 2016); see also Hisler v. Gallaudet Univ., 344 F. Supp. 2d 29, 35 (D.D.C. 2004) ("[A] trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." (quoting Leyva v. Certified Grocers of Cal., Ltd., 593 F.2d 857, 863-64 (9th Cir. 1979))).  The "power to issue a stay may be appropriately exercised" when a "separate proceeding bearing upon the case" will likely "narrow the issues in the pending case[ ] and assist in the determination of the questions of law involved."  Hulley Enter. Ltd. v. Russian Fed'n, 211 F. Supp. 3d at 276 (quoting Landis v. N. Am. Co., 299 U.S. at 253).  The independent proceedings need "not settle every question of fact and law" but should "settle some outstanding issues and simplify others."  Allen v. District of Columbia, Civil Action No. 20-2453 (TSC), 2024 WL 379811, at *2 (D.D.C. Feb. 1, 2024) (quoting Landis v. N. Am. Co., 299 U.S. at 256).

## III.  DISCUSSION

### A.  Changed Circumstances

On December 22, 2025, in the interest of judicial economy, the Court ordered that all proceedings in cases related to EO 14251 and 14343 be stayed "[i]n light of the D.C. Circuit's anticipated decision(s) in Nat'l Treasury Emps. Union v. Trump, No. 25-5157 (D.C. Cir.), Am. Foreign Serv. Ass'n v. Trump, No. 25-5184 (D.C. Cir.), and Fed. Educ. Ass'n v. Trump, No. 25-5303 (D.C. Cir.)."  Int'l Fed. of Pro. and Tech. Eng'rs v. Trump, Civil Action No. 25-3615 (PLF), Minute Order (D.D.C. Dec. 22, 2025).

15

GESTA asks the Court for a "limited," "targeted modification" of the Court's stay. See Mot. at 9; Reply at 9. GESTA argues that three changed circumstances warrant modification: (1) "NASA's voluntary pause on GSA shipments [was] extended only through June 30, 2026," (2) "Judge Cooper['s] deni[al of] preliminary relief in Williams on April 29, 2026, without deciding the EO/settlement-agreement question," and (3) NASA management['s] disclos[ure] that "EO 14343—not the 2022 Master Plan—is NASA's actual basis for treating the Settlement Agreement as unenforceable." Reply at 10. GESTA also suggests that the "extended gap" between this Court's issuance of the stay and the anticipated issuance of a decision from the D.C. Circuit in Nat'l Treasury Emps. Union v. Trump, No. 25-5157 (D.C. Cir.), Am. Foreign Serv. Ass'n v. Trump, No. 25-5184 (D.C. Cir.), and Fed. Educ. Ass'n v. Trump, No. 25-5303 (D.C. Cir.) "is itself a changed circumstance." See Reply at 9. The Court is unpersuaded that the circumstances that GESTA highlights are sufficiently related to the ongoing reason for which the Court initially granted the stay – judicial economy – to warrant the relief GESTA requests. See Marsh v. Johnson, 263 F. Supp. at 52 ("When circumstances have changed such that the court's reasons for imposing the stay no longer exist or are inappropriate, the court may lift the stay.").

GESTA seeks a modification of the stay in this case so that the Court may consider its application for emergency injunctive relief. See Mot. at 9 ("GESTA does not seek to disturb [the] stay generally. It asks only for a limited modification so the Court can prevent irreversible harm"). The "preservation" relief GESTA requests, however, is neither "modest" nor "narrowly targeted." See id. at 13; Reply at 19. GESTA asks the Court to issue "a preliminary injunction ordering NASA to "refrain from irreversibly destroying, discarding, or permanently transferring outside NASA's custody the materials formerly housed in the Goddard

16

Library—and maintain inventory, provenance, chain-of-custody, and location information sufficient to permit meaningful relief if EO 14343 is held unlawful." Reply at 19; see also Mot. at 7. Yet, GESTA offers no support for its assertion that "[n]arrow preservation that prevents irreversible destruction of the settlement-protected resource does not require the Court to adjudicate EO 14343's validity now; it requires only that the Court prevent NASA from creating irreversible facts on the ground while that question is pending." See Reply at 7. The Court disagrees.[2]

GESTA's request for injunctive relief, like each of the requests the Court has considered from other union plaintiffs challenging the related executive orders, is coextensive with the merits of its challenge to the legality of EO 14343. To receive the requested relief, GESTA must persuade the Court that it is likely to succeed on the merits of its claims: that the executive order is ultra vires as applied to NASA and its implementation is arbitrary and capricious. See GESTA Compl. ¶¶ 21-29; see also Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (noting that a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief" (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008))).[3] "A preliminary injunction is an extraordinary remedy never awarded as of

---

[2]    When asked at the hearing on its motion what case law or statutory authority supports the argument that GESTA is entitled to "narrow" "preservation relief" without reaching the merits, counsel for GESTA cited no case law or statute in support. He asserted that as it pertains to this case, it "really, again, comes down to a question of fairness. We don't believe the government should be allowed to move forward on a dismantling effort when its grounds for doing so are being legally challenged. That is the issue before the Court." See Transcript of Record, Int'l Fed. of Pro. and Tech. Eng'rs v. Trump, Civil Action No. 25-3615 (June 10, 2025) [Dkt. No. 26] ("Hr'g Tr.") at 44:20-25, 45:1.

[3]    To receive preliminary injunctive relief, GESTA must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public

right."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. at 24.  To the extent that GESTA requests emergency preservation relief as a litigation hold "to preserve the status quo while the D.C. Circuit adjudicates the EO's validity," see Reply at 9, "such a hold is not appropriate in a non-FOIA case."  Am. Oversight v. Hegseth, 788 F. Supp. 3d 14, 31 (D.D.C. 2025).

As counsel for GESTA conceded at the hearing on its motion, "in order to seek any clarity or recourse" for the alleged breach of the settlement agreement, the parties must first answer the question of the legality of EO 14343.  See Transcript of Record, Int'l Fed. of Pro. and Tech. Eng'rs v. Trump, Civil Action No. 25-3615 (June 10, 2025) [Dkt. No. 26] ("Hr'g Tr.") at 17:23-25, 18:1-2.  But see Reply at 19 ("GESTA does not ask the Court to invalidate EO 14343, reinstate collective bargaining across NASA, or adjudicate the 2012 Settlement Agreement's continued enforceability.").  The D.C. Circuit's forthcoming decisions in the related appeals are likely to provide guidance to the Court and the parties as to several threshold questions at issue in this case and in GESTA's motion for preliminary injunction:  namely, this Court's jurisdiction, the availability of ultra vires review, and union plaintiffs' likelihood of success on the merits of their claims that EO 14251 and 14343 and their implementation are contrary to law and violate the Constitution.  The appeals before the D.C. Circuit were argued and submitted nearly seven months ago.  The court of appeals therefore is more likely to render its opinions now than it was when this Court originally stayed the case in December, likely in a

interest."  Archdiocese of Wash. v. Wash. Metro. Area Transit Auth., 897 F.3d 314, 321 (D.C. Cir. 2018) (quoting League of Women Voters v. Newby, 838 F.3d 1, 6 (D.C. Cir. 2016)).  Of these, the most important factor is whether a movant has established a likelihood of success on the merits.  See Bailey v. Fed. Bureau of Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024) (citing Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  "[A] failure to show a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion."  Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (citing Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric., 573 F.3d 815, 832 (D.C. Cir. 2009)).

matter of weeks rather "rather than years" or even months.  See Campaign Legal Ctr. v. Correct the Rec., Civil Action No. 23-0075 (JEB), 2023 WL 2838131, at *3 (D.D.C. Apr. 7, 2023) (quoting Unión Fenosa Gas, S.A. v. Arab Republic of Egypt, Civil Action No. 18-2395 (JEB), 2020 WL 2996085, at *5 (D.D.C. June 4, 2020)); cf. Campaign Legal Ctr. v. 45Committee Inc., Civil Action No. 22-1115 (APM), 2022 WL 3088595, at *1 (D.D.C. July 18, 2022) (denying stay in case involving three related matters at various stages of litigation with "no assurance as to when any of the three related matters will conclude").

The Court agrees with defendants that "the pending proceedings in the [D.C.] Circuit are likely to settle or simplify the outstanding issues" and, as a result, "lifting the stay is unlikely to make efficient use of court or party resources."  See Opp. at 22 (citing Wilderness Soc'y v. Trump, Civil Action No. 17-2587 (TSC), 2024 WL 4880449, at *2 (D.D.C. Nov. 25, 2024).  "Litigating essentially the same issues in two separate forums is not in the interest of judicial economy or in the parties' best interests."  Naegele v. Albers, 355 F. Supp. 2d 129, 141 (D.D.C. 2005) (quoting Nat'l Shopmen Pension Fund v. Folger Adam Sec., 274 B.R. 1, 3 (D.D.C. 2002)).  The Court is unpersuaded that the stay is no longer warranted, "as lifting the stay is unlikely to either provide Plaintiffs the relief they seek anytime soon or make efficient use of the Court's or the parties' resources."  See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs., Civil Action No. 20-1630 (JEB), 2021 WL 4033072, at *2 (D.D.C. Sep. 3, 2021).  The Court's interest in judicial economy, therefore, still favors a stay.

*B. Balance of the Harms*

In deciding whether to maintain a stay, the Court must weigh its determination that staying further proceedings promotes efficiency against any hardship to the parties. See Hopi Tribe v. Trump, Civil Action No. 17-2590 (TSC), 2024 WL 4880466, at *3 (D.D.C. Nov. 25, 2024) (citing Landis v. N. Am. Co., 299 U.S. at 256).

Here, GESTA argues that it will be irreparably harmed if the stay remains in place and "NASA is permitted to destroy the practical value of the 2012 Settlement Agreement before" the D.C. Circuit provides guidance on the validity of EO 14343. See Reply at 9; see also Mot. at 9 ("If the Court leaves the stay intact without preserving the Goddard Library status quo, the challenged implementation of EO 14343 may permanently eliminate the very settlement agreement interest at issue before the courts can determine whether that implementation was lawful."). GESTA offers little support for its assertion that "[o]nce the Goddard Library collection is destroyed, discarded, permanently transferred outside NASA custody, irreversibly dispersed, or stripped of inventory and provenance sufficient to restore it, neither GESTA nor the Court can reconstruct the settlement-agreement status quo through a final judgment." Mot. at 12; see also Reply at 16 ("Once materials enter the GSA disposal stream, provenance, chain-of-custody, and restoration capacity are effectively lost. . . . If [the library's physical library collection] is destroyed, the [settlement] agreement cannot be reinstated in substance."). Counsel for NASA conceded that "the dispositioning of these materials may result in some of them, as they've said, being donated or destroyed or otherwise taken out outside of NASA custody." Hr'g Tr. at 31:23-25; 32:1. But GESTA has not pointed the Court to a single unique material that cannot be repurchased or replaced. Rather, as defense counsel said at the hearing, it appears

20

GESTA is asking the Court to simply "assume that anything that happens to a book is an irreparable injury." Id. at 32:6-7.

The Court agrees that this assumption goes beyond the language of the 2012 Settlement Agreement and NASA's assertions of the practical effects of its consolidation plans. See Opp. at 8 ("[T]he material NASA plans to keep in its library is being consolidated with the existing collection at NASA's Glenn Research Center while part of the 'excess' material has been sent to GSA."); see also id. at 36 ("NASA seeks to remove excess materials and consolidate its library collection. This change does not rise to the level warranting emergency relief."). GESTA has not demonstrated that the practical value of its settlement agreement interest "protects" the Goddard Library materials against NASA's anticipated consolidation actions nor that the agreement's value would be irrevocably destroyed absent the broad injunctive relief GESTA seeks here. See Mot. at 8, 11-12. Such speculative harm does not outweigh the Court's determination that the stay is in the best interest of the Court and the parties. See Hopi Tribe v. Trump, 2024 WL 4880466, at *3.

At the hearing on the motion, GESTA focused on a different theory of harm, repeatedly asserting that the irreparable harm at issue here is "the inability to exercise the collective bargaining rights. . . . [W]e're not arguing right now . . . about the materials and whether the closure of a physical library irreparably harms us. We are focusing on the fact that the inability to properly negotiate under the terms of this agreement or enforce this agreement is the irreparable harm." See Hr'g Tr. at 39:16-25; see also Reply at 15 ("[T]he loss of labor representation and the impairment of a union's ability to protect a specific contractual right constitutes irreparable harm."). As GESTA notes, this Court has held previously that the loss of labor representation and collective bargaining rights constitutes irreparable harm. See Reply

21

at 15 (citing NTEU, 780 F. Supp. 3d at 263).  The Court, however, already considered this harm as it relates to all union plaintiffs when it stayed all cases related to EO 14251 and 14343 and held all pending motions in abeyance.  See, e.g., Int'l Bhd. of Elec. Workers v. Trump, Civil Action No. 25-3826 (PLF), Complaint for Declaratory and Injunctive Relief (D.D.C. Oct. 30, 2025) [Dkt. No. 1] at ¶¶ 126-133 (detailing union plaintiffs' harms from the dismantling of collective bargaining rights); Nat'l Weather Serv. Emps. Ass'n v. Trump, Civil Action No. 25-2947 (PLF), Motion for Preliminary Injunction (D.D.C. Oct. 24, 2025) [Dkt. No. 15] at 37-41 (arguing that the loss of union recognition and repudiation of collective bargaining agreements inflicts "immediate, irreparable harm" on employees and union plaintiffs).  In the absence of changed circumstances, the Court concludes that the interest in judicial economy continues to outweigh the potential harm caused to GESTA and other union plaintiffs by the loss of collective bargaining rights.

In light of GESTA's assertion that maintaining the stay harms its interests, defendants "must make out a clear case of hardship or inequity in being required to go forward." Landis v. N. Am. Co., 299 U.S. at 255. Because the scope of the stay is relatively limited given the impending decisions from the D.C. Circuit, however, defendants need not show a "pressing need." See Campaign Legal Ctr. v. Correct the Rec., 2023 WL 2838131, at *3 (citing Belize Soc. Dev., 668 F.3d at 732 (requiring "finding of a pressing need under Landis v. N. Am. Co." only when stay is "sufficiently indefinite")).  Defendants argue that lifting the stay "would unnecessarily expend the parties' and the Court's judicial resources" because – contrary to GESTA's assertion that the Court need not touch the merits of its ultra vires and APA challenge to EO 14343 – the issues underlying GESTA's request for injunctive relief are "fully coextensive with the evaluation on the merits" of IFTPE's broader challenge to the legality of EO 14343.

22

See Opp. at 22 (citing Mot. at 9).  Defendants also note that because this Court would be maintaining a stay only pending the outcome of a related appeal, the delay from the stay "remains relatively 'slight.'"  See id. (quoting Campaign Legal Ctr. v. Correct the Rec., 2023 WL 2838131, at *3).  The Court agrees with defendants.

While GESTA is correct that "being required to defend a suit, without more, does not constitute a clear case of hardship or inequity," see Reply at 10, courts in this district "consider the burdens of litigation" when deciding whether a stay is appropriate, especially where the other party "has not shown substantial harm from delay."  Allen v. District of Columbia, 2024 WL 379811, at *5 (D.D.C. Feb. 1, 2024).  GESTA has not demonstrated substantial harm.  Lifting the stay to adjudicate GESTA's request for injunctive relief while the related appeals remain pending would impose litigation costs that may soon be obviated by the D.C. Circuit's decisions.  This hardship weighs in favor of a stay. See Campaign Legal Ctr. v. Correct the Rec., 2023 WL 2838131, at *3.

In the circumstances presented here, the Court concludes that maintaining the limited stay imposed by this Court will "allow the parties and the court the benefit of the [D.C. Circuit's] ruling clarifying the law in this muddied field."  See Allen v. District of Columbia, 2024 WL 379811, at *5.  Because "litigating essentially the same issues in two separate forums is not in the interest of judicial economy or in the parties' best interests regarding time, cost, and effort," it is prudent to wait for the D.C. Circuit to issue its decisions before deciding how best to proceed in this Court.  Campaign Legal Ctr. v. Correct the Rec., 2023 WL 2838131, at *4 (D.D.C. Apr. 7, 2023) (quoting Nat'l Shopmen Pension Fund v. Folger Adam Sec., Inc., 274 B.R. 1, 3 (D.D.C. 2002)).

Furthermore, any harm to GESTA is mitigated by the fact that its interests are adequately represented by IFTPE. Although an intervenor's burden of showing inadequacy of representation is "minimal," see Trbovich v. United Mine Workers of Am., 404 U.S. 528, 538 n.10 (1972), a presumption of adequate representation exists if both the intervenor and the existing party have the same ultimate objective. See Atl. Refinishing & Restoration, Inc. v. Travelers Cas. & Sur. Co. of Am., 272 F.R.D. 26, 30 (D.D.C. 2010). As GESTA acknowledges in its emergency motion, its claim shares a common question with IFPTE's challenge: "whether NASA may implement the EO by terminating or disregarding collective-bargaining and settlement obligations." Mot. at 8. Contrary to GESTA's assertions, IFPTE raises the "retroactivity theory" in its complaint, arguing that "EO 14343 and NASA's implementation of EO 14343 seek to retroactively nullify collective bargaining agreements," depriving IFPTE and its members of their "vested rights under such collective bargaining agreements and, thus, their constitutionally protected property interests in such collective bargaining agreements." IFPTE Compl. ¶¶ 76-77, 85. Contra Reply at 7 ("IFPTE has not raised and is not positioned to raise this retroactivity theory").

GESTA's 2012 Settlement Agreement is an instrument of its collective bargaining agreement. See Hr'g Tr. at 10:8-10 ("We have a collective bargaining agreement, or a piece of it, a settlement agreement, that has been terminated"); id. at 16:4-7 ("[W]e have a very specific example of a collective bargaining right as laid out in this . . . settlement agreement. And that right has been terminated."); id. at 8:21-23 ("[T]he terms of the [settlement] agreement were to be enforced through GESTA's collective bargaining rights."). GESTA's interest in the loss of its bargaining rights pursuant to the 2012 Settlement Agreement, therefore, are likely adequately represented by IFPTE's claims.

24

GESTA's interests are also represented in GESTA's continuing efforts before Judge Cooper to preseve the practical value of its 2012 Settlement Agreement under its FRA and APA claims. See Williams v. NASA, Civil Action No. 26-0564 (CRC), Amended Complaint (D.D.C. May 28, 2026) [Dkt. No. 30] at 47 (asking the Court to "[e]njoin NASA from destroying, disposing of, transferring, excessing, dispersing, or irreversibly separating Goddard Library materials pending lawful decision-making on remand" and "[o]rder NASA to preserve Goddard Library materials in their present or functionally equivalent form pending lawful decision-making on remand"). At this juncture, "the prejudice [GESTA] may experience from the continuation of this stay is minimal" and any harm it may suffer is outweighed by the court and the parties' interest in judicial economy. See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs., 2021 WL 4033072, at *2; Allen v. District of Columbia, 2024 WL 379811, at *5.

To both preserve resources and because there is minimal prejudice to GESTA, the Court, in its discretion, concludes that "circumstances have [not] changed such that the court's reasons for imposing the stay no longer exist or are inappropriate." Marsh v. Johnson, 263 F. Supp. 2d at 52. The Court, therefore, declined to lift the stay.

For all these reasons, GESTA's Emergency Motion to Intervene, to Modify the Stay, and for Temporary Restraining Order and Preliminary Injunction [Dkt. No. 13] was DENIED by Order on June 30, 2026.

PAUL L. FRIEDMAN
United States District Judge

DATE: 7/24/26

25